**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
235 Main Street
Hackensack, New Jersey 07601
Tel.: (973) 265-1600
Email: ek@zlk.com

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT DE VITO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIQUID HOLDINGS GROUP, INC., BRIAN M. STORMS, KENNETH D. SHIFRIN, RICHARD SCHAEFFER, BRIAN FERDINAND, JAY BERNSTEIN, DARREN DAVY, DAVID FRANCESCANI, WALTER RAQUET, THOMAS ROSS, VICTOR SIMONE, JR. DENNIS SUSKIND, ALLAN ZAVARRO, and SANDLER O'NEILL & PARTNERS, L.P.,<br><br>Defendants. | Case No. 2:15-cv-06969-KM-JBC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Co-Lead Plaintiffs Michael Sanders and Sidney R. Berger, along with Plaintiff Richard Karl Schmidt Trust (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Liquid Holdings Group, Inc. ("Liquid" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Liquid's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of Liquid securities: (i) in Liquid's initial public offering on July 26, 2013 (the "IPO"); and/or

(ii) on the public market between July 26, 2013 and September 24, 2015, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Liquid was a company that should have never gone public. Liquid was created to serve as a fraudulent vehicle for the sole purpose of enriching Liquid's executives, directors, and founders. Instead of investing in a company with genuine market value, Defendants sold investors a bill of goods. Defendants hid this reality from investors and perpetuated the fraud at hand by issuing false and/or materially misleading statements concerning the Company's operations and related-party transactions. These false and/or materially misleading statements concealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment. As the risks surrounding Defendants' conduct materialized during the Class Period, Liquid's stock price sank lower and lower.

3. Defendants' misrepresentations concealed a series of untoward related-party transactions among senior executives and founders at Liquid. These transactions had the effect of enriching the Company's Chief Executive Officer, Brian Storms ("Storms"), as well as ensuring that Defendants would be able to

successfully hold the Company's IPO. Similarly, Defendants intentionally withheld information about the Company's operations, specifically those relating to the Company's largest and most important client, QuantX Management LLP ("Quantx"), which was partially owned by Liquid's co-founder, Brian Ferdinand ("Ferdinand").

4. Each of Defendants' misrepresentations and/or omissions concealed the fact that Liquid was a sham. Plaintiffs assert claims under the Securities Act and the Exchange Act arising from these misrepresentations. The Securities Act claims are not based in fraud, but rather negligence and/or strict liability. Liquid's Registration Statement[1] contained omissions concerning the Company's related-party transactions that should have been disclosed at the time of the IPO, but were not due to Defendants' negligence. These related-party transactions were ultimately disclosed in the course of an internal investigation performed by the Company's Audit Committee (the "Investigation").

5. Unlike Plaintiffs' Securities Act claims, Plaintiffs' claims under the Exchange Act sound in fraud. Defendants' deception began with the Company's

[1] "Registration Statement" refers collectively to Liquid's Registration Statement on Form S-1 filed with the SEC on April 11, 2013, Amended Registration Statements on Form S-1/A filed with the SEC on May 13, 2013, May 31, 2013, June 19, 2013, July 5, 2013, July 9, 2013, July 24, 2013, and July 25, 2013, and Prospectus on Form 424 filed with the SEC on July 26, 2013.

IPO. Unbeknownst to the general investing public, Company-insiders artificially inflated Liquid's IPO price of $9.00 per share. Defendant Ferdinand, along with one of Liquid's founders and former directors, Robert Keller ("Keller"), and one of Liquid's largest shareholders, Douglas J. Von Allmen ("Von Allmen"), engaged in pre-IPO transactions allowing Von Allmen to purchase significant shares of Liquid stock for almost 30% less than the amount charged to the public. Although the Company told investors that these insiders were purchasing shares of Liquid's stock in the IPO, Defendants withheld the fact that the shares being purchased by these insiders were being bought at a steeply discounted price. Importantly, these insider purchases accounted for approximately 50% of the shares being offered in the IPO. Consequently, without these insider purchases, the IPO would have been undersubscribed and would not have been able to proceed due to lack of demand in the market. Ferdinand's insider-deal with Von Allmen enabled the Company to conduct its IPO and, in turn, allowed Ferdinand to achieve significant bonuses from the Company.

6. As noted above, Defendants also intentionally withheld information about the Company's operations, specifically those relating to the Company's largest and most important client, QuantX. As was later revealed by the Company's Audit Committee, Liquid's chief executives had been improperly recognizing revenue supposedly received from QuantX even though they knew that QuantX was unable

to pay and, in fact, would be declaring bankruptcy. Liquid's executives knew that QuantX was unable to pay because QuantX was owned and/or managed by Ferdinand and Richard Schaeffer ("Schaeffer"), former director and Chairman of the Board of Liquid, and considered a "related party" to Liquid because of past and present relationships between it and the Company. An internal investigation performed by Liquid's Audit Committee confirmed that "certain members of [Liquid's] management" knew by at least June 2014 that QuantX was "experiencing significant liquidity issues."

7. Defendants' fraud (in the case of the Exchange Act claims) ran rampant throughout the Company's existence, which spanned just above two years between its IPO and bankruptcy filing in early 2016. Defendants failed to comply with their disclosure obligations as well as intentionally misled investors so as to benefit financially for their own personal gain. Defendants reaped millions of dollars of profit through insider stock sales, cash bonuses related to the consummation of the IPO, one-sided loans, and improper use of corporate funds for personal expenses. The concrete personal benefits enjoyed by Defendants, along with the clear allegations of actual knowledge of wrongdoing, gives rise to a strong, cogent and compelling inference of scienter. Further proof of intentional wrongdoing is evidenced by the fact that Liquid (in bankruptcy) maintains claims for self-dealing

and conversion against a number of the Company's insiders. The Company and/or these insiders are also under investigation by the SEC.

8. In sum, Liquid should never have become a publicly traded company. Defendants' negligence and fraud induced investors to invest in a fraudulent vehicle that was destined to fail by all legitimate metrics. Defendants' negligence and fraud prevented investors from learning of this risk and avoiding Liquid at all costs. Liquid's ultimate demise was a materialization of this risk, and investors have lost millions of dollars as a consequence.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the Company has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

12. Co-Lead Plaintiff Michael Sanders ("Sanders") purchased Liquid common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud. Sanders previously filed his certification evidencing his transactions in Liquid securities with the Court in connection with his motion for appointment as Lead Plaintiff. Sanders' certification is incorporated herein by reference.

13. Co-Lead Plaintiff Sidney R. Berger ("Berger") purchased Liquid securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud. Berger previously filed his certification evidencing his transactions in Liquid securities with the Court in connection with his motion for appointment as Lead Plaintiff. Berger's certification is incorporated herein by reference.

14. Plaintiff Richard Karl Schmidt Trust (the "Trust") purchased Liquid securities pursuant and/or traceable to the IPO and in reliance upon the materially false and misleading Registration Statement materials, and was injured thereby. The Trust's certification evidencing its transactions and willingness and authority to serve as a plaintiff in this action is attached hereto as "Exhibit A."

15. Defendant Storms was, at all relevant times, the Chief Executive Officer ("CEO") and a director of the Company. Between July 25, 2013 and

December 23, 2014, Storms served as Chairman of the Company's Board of Directors (the "Board"). Storms signed the Company's Registration Statement as CEO and director of the Company. Effective as of March 1, 2015, Storms transitioned from the role of CEO to Vice Chairman of Liquid. As a director, Storms provided advice and counseling to the Company in the areas of sales, marketing and strategy. Storms tendered his resignation from the Company on September 8, 2016.

16. Defendant Kenneth D. Shifrin ("Shifrin") was Chief Financial Officer ("CFO") of Liquid until October 24, 2014 when he resigned from the Company. Shifrin also signed the Company's Registration Statement as CFO.

17. Defendant Schaeffer was a director and Chairman of the Board of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Schaeffer ceased serving as the Chairman of the Board of Liquid Holdings on July 26, 2013 and on December 23, 2013, Schaeffer tendered his resignation as a member of the Board.

18. Defendant Ferdinand was a director and Vice Chairman of the Board of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. On April 18, 2014, Ferdinand tendered his resignation as Vice Chairman and a member of the Board. He also resigned from his position as the Company's Head of Corporate Strategy.

19. Defendant Jay Bernstein ("Bernstein") was a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Bernstein tendered his resignation as a member of the Company's Board effective October 28, 2014.

20. Defendant Darren Davy ("Davy") was a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Davy tendered his resignation from the Board on September 22, 2014.

21. Defendant David Francescani ("Francescani") was, at all relevant times, a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22. Defendant Walter Raquet ("Raquet") was, at all relevant times, a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23. Defendant Thomas Ross ("Ross") was a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Ross tendered his resignation on September 22, 2014.

24. Defendant Victor Simone, Jr. ("Simone") was, at all relevant times, a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. On December 23, 2013, the Board elected

Simone to serve as the Non-Executive Chairman of the Board, succeeding Storms as Chairman of the Board.

25. Defendant Dennis Suskind ("Suskind") was, at all relevant times, a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Suskind replaced Zavarro as Chairman of the Audit Committee on February 20, 2015.

26. Defendant Allan Zavarro ("Zavarro") was a director of Liquid and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Zavarro also served as a Chairman of the Audit Committee until he tendered his resignation from the Board effective February 20, 2015.

27. Defendant Sandler O'Neill & Partners, L.P. ("Sandler") served as the sole underwriter of the Company's IPO. The IPO was a firm commitment offering, meaning that Sandler purchased all of the shares of common stock being offered by Liquid in the offering (*i.e.*, Sandler purchased all 3,094,921 shares directly from Liquid before selling them to the public). In connection with the IPO, Sandler received an underwriting discount in the amount of $1,857,375 plus reimbursement of up to $700,000 for reasonable out-of-pocket expenses.

* * *

28. "Section 11 Defendants" refers to Defendants Storms, Shifrin, Schaeffer, Ferdinand, Bernstein, Davy, Francescani, Ross, Simone, Suskind, Zavarro, Raquet, and Sandler.

29. "Section 15 Defendants" refers to Defendants Storms, Shifrin, Schaeffer, Ferdinand, Bernstein, Davy, Francescani, Ross, Simone, Suskind, Zavarro, and Raquet.

30. "Section 10(b) Defendants" refers to Defendants Storms, Shifrin, and Ferdinand.

31. "Section 20(a) Defendants" refers to Defendants Storms, Shifrin, and Ferdinand.

32. "Scheme Defendant" refers to Ferdinand.

33. The Section 15 Defendants and Section 20(a) Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Liquid's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Section 15 Defendant and Section 20(a) Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew

that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

34. If Liquid were a party to this action, then it would be liable for the acts of the Section 15 Defendants and Section 20(a) Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

35. If Liquid were a party to this action, then the scienter of the Section 20(a) Defendants and other employees and agents of the Company would similarly be imputed to Liquid under *respondeat superior* and common law agency principles.

## **RELEVANT NON-PARTIES**

36. Non-party Liquid is incorporated under the laws of Delaware and its principle executive offices are located at 111 River Street, Suite 1204, Hoboken, New Jersey 07030. Shares of the Company's common stock began trading on the NASDAQ Global Market exchange (the "NASDAQ") under the ticker symbol "LIQD" on July 26, 2013. As discussed more fully below, NASDAQ suspended and eventually delisted Liquid's common stock on October 28, 2015. Liquid subsequently filed for bankruptcy on January 27, 2016. Liquid's bankruptcy case is styled *In re Liquid Holdings Group, et al.*, No. 16-10202 (KG) (Bankr. D. Del.). On

February 25, 2016, the U.S. Bankruptcy Court for the District of Delaware converted Liquid's bankruptcy from a Chapter 11 case to a Chapter 7 case. Notwithstanding anything to the contrary herein, Liquid is not a party to this case and Plaintiffs' claims are not to be construed as violating the automatic bankruptcy stay, 11 U.S.C. § 362(a).

37. Non-party Peter R. Kent ("Kent") was CFO of Liquid beginning October 27, 2014. Effective March 1, 2015, Kent was appointed by the Board to succeed Storms as CEO. In addition to serving as CEO, Mr. Kent continued in his role as CFO.

38. Non-party Von Allmen was a pre-IPO investor and holder of more than 10% of Liquid's common stock. As of May 8, 2014, Von Allmen beneficially owned over 26% of Liquid's common stock. Von Allmen also controlled D&L Partners, L.P. ("D&L Partners"). Additionally, D&L Partners originally formed Prime Partners, LLC, which was acquired by Liquid.

39. Non-party Keller is the managing member of CMK Keller Holdings, LLC and helped found Liquid. Keller and Ferdinand owned Green Mountain Analytics, Liquid View, Liquid Futures, LLC, and Liquid Trading Institutional LLP before their acquisition by Liquid. Keller and Ferdinand are also part owners of QuantX. On May 1, 2013, the Company entered into a letter agreement with Keller ending his employment with Liquid as a senior managing director. Pursuant to the

agreement, Liquid agreed to pay Keller certain amounts if the Company was able to consummate an initial public offering prior to December 1, 2014. Liquid ultimately paid Keller $254,247 on August 1, 2013 pursuant to this agreement.

## CONFIDENTIAL WITNESSES

### *Confidential Witness Number 1*

40. Confidential Witness No. 1 ("CW1") worked at Liquid Holdings as the Account Manager from March 2013 until his/her resignation in early 2016. CW1 was based in the Hoboken, New Jersey office, while Ferdinand was located in Manhattan's office. CW1 traveled back and forth between offices when necessary.

41. CW1 was hired by and reported to Liquid's then CFO, Shifrin. Shifrin and CW1 worked together at the New York Mercantile Exchange. CW1 stated that he/she did "everything" during the first several months at Liquid. This included overseeing receivables, payables, forecasting, profit and loss statements, expenses and preparatory work for the July 2013 IPO, including the road show, as well as the secondary offering in May 2014.

42. According to CW1, Liquid "never should have gone public." Throughout CW1's tenure at the Company, Liquid never had one profitable month. Further, according to the witness, at the time of the IPO, "there was no product in place" that did what senior executives were claiming it did, which CW1 knew because of his/her proximity to the CFO and other senior leadership.

43. In early fall 2013, about six months after CW1 was hired, CEO Storms and co-founder Ferdinand brought in Jim Lee as Chief Administrative Officer. One of Lee's main responsibilities was overseeing an elaborate build out in office space that Liquid was renting in Manhattan.

44. According to CW1, Lee expensed personal items to the Company, ultimately stealing approximately $100,000 before he was fired by the Company's Board in late 2014 or early 2015. CW1 stated that Lee had purchased an expensive watch ("several thousand dollars") using his corporate credit card. When CW1 confronted Lee in an email, he said the purchase was related to business/IT products. CW1 told CFO Shifrin who then told Ferdinand and Storms, but they did nothing in response.

45. As time passed, CW1 continued to see improper charges on Lee's credit card, including expensive items such as a large screen television for his home. As far as he/she could determine, none of these charges were used for Lee's work at Liquid. CW1 continued to report the concerns to Shifrin. CW1 said that Storms and Ferdinand did not do anything until Liquid's Board found out about these improper expenses and fired Lee.

46. CW1 stated that Shifrin ultimately "took the fall" for decisions made by Ferdinand and Storm to overlook Lee's thefts, which explained Shifrin's sudden departure from the Company in around September 2014.

47. CW1 stressed that Storms and Ferdinand also made highly improper charges to the Company's corporate credit card. For example, they frequently turned in invoices, receipts, or mostly "little scraps of paper with no information on them" for non-business related items. Storms charged Liquid approximately $30,000 per quarter to cover the salary of his personal driver. Ferdinand turned in cable bills from his homes (permanent home and vacation home), which showed charges for children's movies, other movies, and premium channels. The cable bills were not submitted to cover only Internet, rather Ferdinand expected Liquid to pay for the entire bill. CW1 said that Ferdinand also turned in receipts from a waterpark claiming they were for business, when in fact he had taken his children there.

48. CW1 confirmed that by 2014, Ferdinand had a consulting agreement with Liquid but was not considered a Liquid employee. Nonetheless, Ferdinand continued to expense a significant number of invoices and receipts that appeared unrelated to Liquid.

49. CW1 also stated that QuantX was repeatedly, month after month, late in paying its invoices to Liquid. By late 2013, CW1 was permitted to hire a small accounting staff, which included Cathy Hogan. Hogan oversaw accounts receivable, which would have included QuantX's invoices. CW1 stated that Ferdinand would make excuses for the late payments to Kent, the CFO who replaced Shifrin.

50. CW1 worked closely with KPMG for the 2013 and 2014 audits. CW1 also worked closely with Grant Thornton once KPMG was replaced in 2015. Grant Thornton's resignation resulted from its decision to not sign-off on the 2015 audit. CW1 said that Grant Thornton objected to Liquid's use of Liquid's long-used outside counsel to conduct an internal investigation of certain related-party and/or self-interested transactions and demanded a neutral law firm preside.

*Confidential Witness Number 2*

51. Confidential Witness No. 2 ("CW2") worked at Liquid as an Accounts Payable Specialist from August 2013 until around July 2015. CW2 reported directly to CW1 and was responsible for the employees' expenses and the accounts payable.

52. CW2 stated that Liquid was doing things it should not have been doing and that Liquid tolerated an environment where expenses were abused. CW2 elaborated that some of the Company's senior leadership took advantage of expense accounts. For example, CAO Lee expensed a Rolex watch that he purchased for himself. Additionally, CEO Storms submitted improper expenses related to a car dealership he owned.

53. CW2 also confirmed that Liquid had no proper internal financial controls in place. For example, there was an "Ask the Accountant" expense catchall fund. During CW2's tenure at Liquid, CAO Lee was fully aware of this fund, encouraged its use, and did not make an effort to ensure it was in compliance. CW2

said "all kinds of things" went into this fund, mostly the personal expenses of senior leadership. Another example of improper internal financial controls was that a senior executive had the authority to maintain a corporate credit card as well as authority to sign Company checks, which could be used to pay for charges on the Company credit card.

*Confidential Witness Number 3*

54. Confidential Witness No. 3 ("CW3") worked as the Vice President of Sales for Liquid from April 2013 until 2015 and reported to Tim Garbien, the Senior Vice President Head of Sales. As Vice President of Sales, CW1 knew Liquid's products and was the first sales person Liquid hired to market the products. As such, CW3 was close to the Company's founders.

55. CW3 confirmed that Schaeffer assisted Liquid in going public because Schaeffer "knew how to leverage the Jobs Act and knew how to go public with little revenue and customers." CW3 stated that the capital raised was used to hire senior personnel and furnish a more lavish office space to "impress clients."

56. CW3 also stated that Liquid started building its executive board before any customers were on the books, which he/she described as "putting the cart before the horse." According to CW3, approximately four months after the IPO, Liquid had 120 employees. CW3 stated that there were a lot of "chief level" salaries being paid and other businesses were being started, such as Liquid Prime Brokerage.

57. CW3 also confirmed that Liquid gave QuantX money to use and in return required QuantX to make its customers use Liquid products. CW3 stated that Liquid marketed its product as an Order Executive and Management System ("OEMS"), when in fact the product was "a glorified EMS marketed as an OEMS" and that the challenge was with the OMS.

*Confidential Witness Number 4*

58. Confidential Witness No. 4 ("CW4") was a Lead Architect and Developer of Liquid products from October 2013 until July 2015. CW4 worked out of Liquid's Florida office and reported to Bruce Cooper (former Chief Technology Officer ("CTO") at Liquid). As Lead Architect and Developer, CW4 had a deep understanding and knowledge of how Liquid's products worked.

59. CW4 believed that Liquid "was a homegrown system for an individual investor, not 500 new employees." As CW4 explained, Liquid could not get big customers because the Company did not have a good OMS, and customers would get frustrated because the Company brochure advertised certain capabilities that were not actually in place. According to CW4, Liquid's response was to assure the customer that "Liquid would build it."

60. CW4 also stated that the Company began to raise more capital in order to look "bigger" and lure in larger hedge funds but that the software only worked for hedge funds with up to approximately five traders and the system did not have the

appropriate OMS necessary for a larger volume of traders. CW4 also confirmed that Liquid's executives knew about these issues.

*Confidential Witness Number 5*

61. Confidential Witness No. 5 ("CW5") was the Director of IT Infrastructure for Liquid from October 2012 until February 2016. Prior to CW5's role at Liquid, CW5 was the Director of IT Infrastructure for Green Mountain Analytics until 2012 when Liquid acquired that company. CW5 reported to Cooper, CTO at Liquid and former COO at Green Mountain Analytics. As a former director at Green Mountain Analytics, CW5 had been with the Company since its inception and worked closely with its founders.

62. CW5 stated that although the Company represented that its product was offered through the "cloud," there was no "cloud" *per se*. Additionally, CW5 stated that he/she knew QuantX, and "Quantx was a fund of funds and … those sub-funds were …considered customers by Liquid." CW5 also added that these entities were counted as individuals and explained that the high customer numbers pre-IPO would have been much different if the sub-funds were aggregated. CW5 stated that he/she felt uncomfortable about the number of customers Liquid actually had, compared to what Liquid represented to investors.

*Confidential Witness Number 6*

63. Confidential Witness No. 6 ("CW6") initially worked for Centurion (defined below) in July 2010 and stayed with Centurion until it merged with Liquid in or around October or November 2010. Centurion was run by Joe Gamberelli and Ed Feigles, and funded by Von Allmen. CW6 was an initial investor in Liquid and invested $1 million in a pre-IPO offering. CW6 stated he/she invested in the Company based on representations that Liquid would go public in 2012. CW6 confirmed that Liquid conducted a second pre-IPO offering to raise additional funds to sustain it until the IPO but he/she did not take part.

## SUBSTANTIVE ALLEGATIONS

### A. Background

64. Liquid was a fraudulent vehicle that should have never gone public. Liquid was formed with the intention of being the holding company to acquire and own a group of companies to pursue an IPO. As stated by CW3, Schaeffer assisted the Company going public even though the Company had little revenue or customers. The Company's subsidiaries that were included in the consolidation were: (1) Liquid Futures LLC ("Futures"); (2) Liquid Trading Institutional LLP ("Institutional"); (3) Liquid Partners, LLC, formerly known as Centurion Capital Group, LLC and Centurion Trading Partners, LLC (collectively "Centurion"); (4) Fundsolve Ltd. ("Fundsolve"); (5) LHG Technology Services Ltd.

("Technology"); (6) Liquid Prime Holdings, LLC ("LPH"); (7) Green Mountain Analytics, LLC ("GMA"); and (8) LTI, LLC ("LTI"). Since commencing operations on or about April 24, 2012, Liquid has predominantly served as the Section 10(b) Defendants' personal piggy bank, loaning money to related companies and themselves. According to Liquid's Registration Statement, the following chart represents the Companies acquired by Liquid, the previous owners of the acquired companies, and the amount paid for the acquired companies.

| **Liquid Holdings, LLC** | | | |
|---|---|---|---|
| **Date Aquired** | **Acquired Company** | **Owner(s)** | **Consideration*** |
| December 30, 2011 | *Liquid Partners, LLC* | Von Allmen<br>Feigeles | $12,439,000 (Cash and Liquid Stock) |
| April 23, 2012 | *Fundsolve* | Darren Davy<br>Nicholas Bell | $2,564,210 (Liquid Stock) |
| April 24, 2012 | *Liquid Prime Holdings LLC*<br>*Liquid Trading Institutional LLP*<br>*Liquid Futures, LLC* | Ferdinand<br>Keller<br>Schaeffer | $123,446,000 (Liquid Stock) |
| April 27, 2012 | *Tragara Alpha Partners* | Samuel Gaer | $6,183,000 (Liquid Stock) |
| July 30, 2012 | *LiquidView* | Ferdinand<br>Keller | $1,500,000 (Cash) |
| August 27, 2012 | *Green Mountain Analytics, LLC* | Ferdinand<br>Keller | $19,973,000 (Liquid Stock) |
| September 30, 2012 | *LTI, LLC* | QuantX<br>(Ferdinand, Keller, Schaeffer)<br>Feigeles | $5,079,000 (Liquid Stock) |

*Stock value supplied by Liquid based on values estimated by Liquid management with consideration given to valuation analysis performed by an unrelated third party specialist

65. Out of the various acquisitions above, three were by far the most significant to Liquid's creation: (1) Green Mountain Analytics, LLC ("GMA"); (2) Liquid Partners, LLC (formerly known as Centurion Capital Group, LLC) ("Liquid Partners"); and (3) Fundsolve Limited ("Fundsolve").

66. Green Mountain Analytics, LLC: GMA is the base of Liquid's trading technology, according to Liquid's prospectus. Subsequent to its acquisition by Liquid, GMA's name was changed to Liquid Technology Services, LLC. GMA was incorporated on April 29, 2002, and Ferdinand and Keller initially acquired their equity positions in 2008 and together acquired a majority interest in GMA in 2011.

67. GMA operated as a software development company that provided a trading platform servicing the securities trading industry. In addition, GMA provided software development on a consulting basis. GMA derived the majority of its revenue from related parties.

68. As stated in Liquid's Registration Statement, as of December 31, 2011, GMA had cash of $4,431 and an accumulated deficit of $3,611,603, and as of August 27, 2012, cash of only $84,717. Additionally, according to the independent auditor's report cited in Liquid's Registration Statement, these conditions raised substantial doubt about GMA's ability to continue as a going concern. As such, GMA stated that it believed GMA's ability to continue its operations was dependent upon its ability to raise capital through an acquisition.

69. On August 27, 2012, Liquid acquired GMA pursuant to a contribution and exchange agreement entered into with the members of GMA, including entities controlled by Ferdinand and Keller. Despite the fact that GMA was uncertain as to its ability to continue as a going concern, Liquid issued GMA (*i.e.*, Ferdinand and

Keller) 2,038,857 shares of Liquid common stock (including 654,943 shares each to entities controlled by Ferdinand and Keller). The approximate aggregate value of the interests received by the members of GMA in the exchange transaction, based on values estimated by Liquid management, was $19,973,000 (including $6,411,000 each to Ferdinand and Keller).

70. Liquid Partners, LLC: Liquid's next largest acquisition was of a company called Centurion Capital Group, renamed Liquid Partners. Liquid Partners was originally formed on May 11, 2010 by Joseph Gamberale and D&L Partners (an entity controlled by Von Allmen). In 2011, Liquid Partners' revenue was $60,000, its cash was $8,668, and its net loss was ($4,551,231). Liquid Partners principally financed its operations through related party transactions. Similar to GMA, Liquid Partners believed that its ability to continue operations was dependent upon raising capital through an acquisition.

71. Ferdinand acquired Liquid Partners in December 2011 through Liquid Trading Holdings Limited ("Liquid Trading"). On May 11, 2012, Liquid Trading contributed its equity interests in Liquid Partners and its obligations under the membership interest purchase agreement to Liquid. Despite Liquid Partners' inability to continue as a going concern, Liquid issued $10,300,000 of Liquid common stock as consideration for the acquisition. The amount of consideration issued by Liquid was in large part based upon Liquid Partners' supposed "goodwill,"

which totaled $8,580,157 (along with customer relationships and a non-compete agreement that was valued at $1,993,000).

72. Fundsolve Limited: Liquid's third largest acquisition was Fundsolve, partially owned by Davy, through which, according to the prospectus, Liquid acquired its risk management technology on April 23, 2012. Fundsolve was a United Kingdom company and as of 2012 had cash of £1,368, revenue of £60,359, and net income of £25,075. Liquid issued $1,690,000 of its common stock as consideration for Fundsolve.

73. Although Liquid's three main acquisitions struggled on their own to continue as going concerns, Defendants paid significant amounts of consideration in exchange for the entities that would later be combined and packaged for the purposes of creating Liquid and enriching Defendants and insiders. In order to justify the high prices paid for these entities, the entities were assigned vast amounts of goodwill and intangible assets to make them appear to be worth more than they were. By the time of the IPO, Liquid's balance sheet had expanded to almost $50 million in total assets. However, upon further inspection, $39.9 million of these assets was essentially worthless, and comprised of $21.1 million in goodwill and $18.7 million of other intangible assets. The $40 million of total intangible assets was created from the above-referenced acquisitions. With an inflated balance sheet, Defendants were

able to take Liquid public and profit wildly in the process, all to the detriment of shareholders.

**B. Initial Fundraising and the Initial Public Offering**

74. Prior to the IPO, the Company completed several capital raising transactions, conducted mainly by Ferdinand, Schaeffer, Keller and Von Allmen. The first of these transactions was a $4.3 million sale of Liquid common stock consummated through LTI, LLC in September 2011. LTI, LLC was an entity owned by QuantX and formed by Schaeffer, Ferdinand, and Keller for the purpose of raising capital.

75. The second of these transactions was a $12.5 million sale of Liquid common stock to an entity controlled by Von Allmen in July 2012. Prior to December 25, 2012, the Company issued to Von Allmen 242,020 additional shares of Liquid common stock pursuant to the terms of a subscription agreement with Von Allmen.

76. Liquid also raised an additional $3.3 million in the aggregate through six additional transactions completed in January 2013, February 2013, and March 2013 (including transactions in which Liquid issued 59,918 shares of common stock to Simone, and 183,773 shares of common stock to Bernstein).

77. In April 2013, the Company issued 720,498 shares of common stock to Von Allmen for no monetary consideration purportedly because of his continued financial support and commitment to the Company's development and growth.

78. On May 14, 2013, an entity controlled by Keller, Storms, and three employees transferred a total of 104,431 shares of Liquid common stock to an entity controlled by Von Allmen pursuant to share transfer agreements. On May 15, 2013, an entity controlled by Schaeffer sold 191,616 shares to an entity controlled by Von Allmen pursuant to a share transfer agreement.

79. Additionally, Ferdinand, Keller, and Von Allmen entered into an agreement prior to the IPO to transfer additional shares of common stock to Von Allmen at no cost after the expiration of the lock-up agreements signed in connection with the IPO. However, the Company failed to disclose this information to investors—in particular, the Company failed to disclose that this agreement was entered into prior to the IPO. The fact that this agreement was entered into prior to the IPO was significant because it meant that Von Allmen would be receiving a substantial number of shares in addition to the ones that he paid for publicly and, as explained below, was being used as an incentive to have him ensure that the IPO was adequately subscribed.

80. The following chart indicates Liquid's ownership before and after the IPO:

| Name of Beneficial Owner | Shares Owned pre IPO | | Shares Owned as of 3/24/14 | |
|---|---|---|---|---|
| **Executive Officers and Directors:** | | | | |
| Brian Storms | 1,119,858 | 5.33 % | 1,268,202 | 5.12 % |
| Brian Ferdinand | 5,052,663 | 24.06 % | 5,214,647 | 21.05 % |
| Kenneth Shifrin | — | — | * | — |
| Robert O'Boyle | — | — | * | — |
| Jose Ibietatorremendia | — | — | * | — |
| James Lee | — | — | * | — |
| Jay Bernstein | 444,274 | 2.12 % | 444,274 | 1.79 % |
| Darren Davy | 173,667 | * | 271,920 | 1.09 % |
| David Francescani | 34,733 | * | * | * |
| Walter Raquet | — | — | * | — |
| Thomas Ross | 316,507 | 1.51 % | 316,507 | 1.28 % |
| Richard Schaeffer* | 2,830,185 | 13.48 % | — | — |
| Victor R. Simone, Jr. | 59,918 | * | 59,918 | * |
| Dennis Suskind | 47,904 | * | 47,904 | * |
| Allan Zavarro | 18,193 | * | 18,193 | * |
| **All Directors and Executive Officers as a Group** | 10,097,902 | 48.11 % | 7,993,117 | 32.02 % |
| **Other 5% Stockholders:** | | | | |
| Douglas J. Von Allmen | 2,855,338 | 13.66 % | 6,015,308 | 24.28 % |
| Robert Keller | 2,258,910 | 10.76 % | 1,588,889 | 6.41 % |
| Samuel Gaer | 1,239,913 | 5.96 % | — | — |
| Richard Schaeffer* | 2,830,185 | 13.48 % | 2,161,739 | 8.73 % |

*On December 23, 2013 Schaeffer resigned as a member of the Board
*On January 29, 2014 Schaeffer sold 361,880 shares for a profit of $2.0 million and bringing him below 10%

81. Although Liquid had only been in operation for just over a year and had little revenue and very few customers, the Section 10(b) Defendants took Liquid public on July 26, 2013. By doing so, the shares they held increased dramatically in value overnight due to their newfound liquidity on the NASDAQ exchange. While the shares held by the Section 10(b) Defendants were subject to lock-up agreements, the Section 10(b) Defendants were still able to benefit from the increase in value by

using the shares as collateral for various other transactions as well as selling the shares on the open market once the lock-up agreements expired. At an IPO price of $9.00 per share, the Section 10(b) Defendants (together with Von Allmen and Keller) collectively held over $162 million of Liquid stock that was previously worth far less due to the fact that it was not publicly traded on the NASDAQ exchange.

82. Through the IPO on July 26, 2013, the Company offered 3,175,000 shares of common stock at $9.00 per share. However, demand for the offering was already low, and Ferdinand and Von Allmen agreed to purchase an aggregate of $16,200,000 in shares in the IPO, leaving $12,375,000 in shares to be sold to the public.

83. The Company stated in its "Use of Proceeds" section in the Registration Statement that out of the $26,717,625 received by the Company before expenses in the IPO, the Company would only net approximately $17,400,000. Total IPO expenses were $11,175,000, or 39% of the IPO proceeds, of which $3,196,975 went directly to Schaeffer, Ferdinand, Ross, Storms, and Keller in the form of loan repayments, stock repurchases, IPO bonuses, and one-time payments. The Company indicated that only approximately $14.76 million of the net proceeds from the IPO would be available for business purposes.

**C. QuantX**

84. QuantX was formed on February 18, 2008 and operates as a private trading firm. QuantX was formerly known as Liquid Trading International. According to Liquid's counsel in a letter to the SEC, Liquid Trading Holdings LLC, an entity controlled by Keller and Ferdinand, held a 36.675% interest in Liquid Trading International prior to Liquid's IPO. SHAF Holdings LLC, an entity controlled by Schaeffer, held a 10% interest in Liquid Trading International prior to Liquid's IPO. Collectively, Keller, Ferdinand, and Schaeffer held an interest of over 46% of QuantX through various holding companies.

85. QuantX acts as a fund of funds that concentrates its investments in the emerging funds market and operates by allocating capital to investment managers to invest. Managers are paid a percentage of profits. QuantX is a customer of Liquid's technology platform, which QuantX then markets to its own members, thereby providing Liquid with a source of additional customers.

86. In June 2012, the Company loaned QuantX $5,000,000 so long as QuantX used Liquid's products. For the period of April 24, 2012 (the date Liquid commenced operations) through December 31, 2012, QuantX accounted for 75% of the Company's software licensing revenues. In addition, for the period from April 24, 2012 through December 31, 2012, all related parties, including QuantX, accounted for 86% of Liquid's software licensing revenues. For the three months

ended March 31, 2013, QuantX accounted for 76% of Liquid's software licensing revenues.

87. QuantX continued to be the Company's main revenue source until June 2014, when Liquid management knew that QuantX may have been experiencing significant liquidity issues and could no longer pay Liquid (as confirmed by an internal investigation performed by the Company's Audit Committee). Despite this knowledge, Liquid continued to account for QuantX's revenue in its financials.

**D. The Audit Committee Investigation**

88. On September 24, 2015, the Audit Committee of the Company's Board, with the assistance of outside legal counsel, released the results of the Investigation that lasted over seven months into certain issues raised by counsel to one of the Company's stockholders, including allegations about the Company's former senior management.

89. The investigation was initially conducted by Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), the Company's counsel at that time. Upon the completion of Gibson Dunn's investigation, Grant Thornton, the Company's independent registered public accounting firm, requested that the scope of the Investigation be expanded. When Gibson Dunn delivered the report outlining the results of the expanded Investigation, Grant Thornton requested that independent legal counsel be

engaged to conduct the Investigation. The Audit Committee engaged Ballard Spahr LLP ("Ballard Spahr") to continue the Investigation as requested by Grant Thornton.

90. The Investigation conducted by the Audit Committee with the assistance of Gibson Dunn and Ballard Spahr was internal. Certain parties that were likely to have information relevant to the Investigation declined to participate in the Investigation process. Because such parties declined to cooperate with both Gibson Dunn and Ballard Spahr, the Investigation was hindered and controlled to benefit certain insiders that were responsible for the fraudulent conduct that occurred. Notwithstanding, the Audit Committee received the findings of the Investigation on July 27, 2015 followed by an update on September 11, 2015.

91. Less than one week after the final Investigation findings were delivered to the Audit Committee, Grant Thornton resigned abruptly on September 15, 2015. Grant Thornton refused to approve the Company's financial statements for the quarter ended September 30, 2014, the year ended December 31, 2014, and the quarter ended March 31, 2015.

92. Moreover, as a result of the Audit Committee's Investigation, the Audit Committee found that the Company made material misrepresentations in the Company's Registration Statement and throughout the Class Period. First, the Audit Committee stated that the Company failed to disclose to investors that Ferdinand, Keller, and Von Allmen entered into an agreement prior to the Company's IPO. This

agreement was to transfer additional shares of Liquid's common stock to Von Allmen at no cost after the expiration of the lock-up agreements signed in connection with the IPO, as described in Paragraph 79.

93. Second, the Investigation revealed that Liquid misrepresented a related party transaction between Storms and CMK Keller Holdings, LLC ("CMK"). The Registration Statement classified the transfer of 766,466 shares of Liquid common stock from CMK to Storms as a stock sale for $5,000,000. However, as the Audit Committee stated, this transaction was actually a loan from CMK to Storms.

94. Third, the Investigation also revealed four other non-disclosed loans taken by Storms from related parties throughout the Class Period. These include (i) in March 2014, Ferdinand loaned approximately $1,100,000 to Storms in connection with Storms' tax obligations related to restricted stock units granted by Liquid on December 1, 2012; (ii) in October 2014, Storms received a loan from D&L Partners in the amount of $1,100,000 that Storms used to repay the March 2014 loan to Ferdinand; and (iii) in December 2014, the Bridgehampton National Bank loaned $2,000,000 to Storms, of which $1.1 million was used to repay the October 2014 loan from D&L Partners. Suskind, Chairman of the Audit Committee, is also Vice Chairman of Bridge Bancorp, Inc., the registered bank holding company for the Bridgehampton National Bank. In addition, based on the results of the Investigation,

it appears that D&L Partners loaned $130,000 to Storms in May 2014 to buy shares of Liquid common stock in the open market.

95. Fourth, in addition to the related party transaction misrepresentations, the Investigation also found that during June 2014, certain members of management became aware that QuantX may have been experiencing significant liquidity issues, which created uncertainty thereafter as to QuantX's ability to meet its financial obligations despite the fact that as of June 30, 2014, QuantX was not in arrears for any previously purchased software services.

96. Based on the Investigation's findings and upon the recommendation of the Company's executive officers, on September 10, 2015, the Audit Committee and the Board concluded that Liquid's previously issued unaudited condensed consolidated financial statements as of September 30, 2014 and for the three and nine months ended September 30, 2014 should no longer be relied upon and should be restated due to certain accounting errors. The accounting errors involved the premature recognition of revenue from QuantX and from Liquid's other customers that had received allocations of capital from QuantX during the quarter ended September 30, 2014, before collectability was reasonably assured, given the significance of the uncertainty of collections from QuantX and QuantX-related customers that became known to certain members of management during June 2014.

Thus, as to each of the periods to be restated, the Company and its Board conceded that they made materially false statements to investors.

**THE SECURITIES ACT CLAIMS**

97. These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, are based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of the Section 11 Defendants' investigation of the true facts underlying the alleged misstatements and omissions. These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained elsewhere in this Complaint that allege fraud or scienter. These Securities Act claims are not based on any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance on fraud allegations for the purpose of these claims.

98. Liquid's IPO occurred on July 26, 2013. In the IPO, Liquid sold 3,125,000 shares of common stock for a per-share price of $9.00. The IPO was a firm commitment underwriting, meaning that Sandler purchased the entirety of the shares sold in the offering (less 80,079 shares sold by Liquid directly to Ferdinand) in order to re-sell them to the public at the IPO price. At the time of the IPO, all other

previously issued and outstanding registered shares were subject to lock-up agreements and were not freely tradeable on the open market.

99. Liquid's Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within the Registration Statement relate to the disclosure of related-party transactions as well as representations concerning the Company's customer base. Notwithstanding this obligation to disclose these transactions and provide accurate infomration at the time Liquid's Registration Statement became effective, the Section 11 Defendants failed to disclose material information.

100. On July 26, 2013, Liquid filed its Registration Statement with the SEC announcing the Company's IPO. The Company stated the following about "Related Party Transactions":

> On May 14, 2013, CMK Keller Holdings, LLC sold Mr. Storms 766,466 shares for $5,000,000. We estimated the fair value of the shares sold at $5,780,000. As a result of this sale below fair value, we will record a 2013 share-based compensation expense in the second quarter of 2013.

(2013 Prospectus at 133.)

101. The above statement about related party transactions was materially false. First, the Registration Statement was false because it misrepresented Storms' loan from CMK as a stock sale. The Company stated that Keller sold Storms 766,466

shares of Liquid common stock for $5,000,000. In reality, Keller gave Storms 766,466 shares of Liquid common stock in return for a promissory note in the principal amount of $5,000,000 that was later reduced to $1,250,000.

102. Next, the Registration Statement was false because it omitted a pre-IPO agreement whereby Keller and Ferdinand agreed to transfer an additional 732,292 shares of Liquid common stock to an entity controlled by Von Allmen for no cash consideration once the shares were no longer subject to lock-up agreements signed in connection with the IPO.

103. Von Allmen initially purchased 1,722,100 shares of Liquid common stock through the IPO at $9 per share. This resulted in a total cost to Von Allmen of $15,498,900 before expenses. However, because of the stock transfer agreement, Von Allmen received an additional 732,292 shares at no consideration for a total of 2,454,392 shares at $6.31 per share ($15,498,900/2,454,392 shares). This resulted in an almost 30% discount to the market rate. The failure to disclose this transaction was significant because although the Company represented the value of Liquid shares to be $9 per share, internally, the Company only valued the shares at $6.31 per share.

104. The omission of the stock transfer agreement was material to Liquid investors because the true facts, *i.e.*, that the true value of Liquid common stock was

only $6.31 per share, would have altered the total mix of information available to investors when deciding whether to purchase Liquid stock.

105. The transaction between CMK, Keller, and Storms as well as the stock transfer agreement between Von Allmen, Ferdinand, and Keller were material because a) both Von Allmen (in the stock transfer agreement) and Storms (in the loan) did not deem the shares of Liquid common stock valuable enough to pay the public offering price or use his own money; and b) the Company deemed it material enough to issue a restatement.

106. In addition, Liquid's Registration Statement provided investors with information concerning the Company's customers. The Company identified "number of customers" as a "Key Metric" that Liquid monitored to "evaluate our business, measure our performance, identify trends affecting our business and make strategic decisions." As of December 31, 2012, March 31, 2013, and June 1, 2013, the Registration Statement indicated that Liquid had 20, 25, and 23 customers. The Registration statement sated that "[w]e believe that our ability to expand our client base is an indicator of our market penetrations and the growth of our business as we continue to invest in our direct sales and marketing teams."

107. The Section 11 Defendants failed to properly investigate and/or perform due diligence with regard to the above statement about Liquid's customers. According to CW5, the Registration Statement inaccurately included parties and/or

entities as customers that should not have been customers. Specifically, CW5 explained that "QuantX was a fund of funds and … those sub-funds were …considered customers by Liquid." CW5 stated further that these entities were counted as individuals and explained that Liquid's number of customers would have been materially different had Liquid not counted QuantX's "sub-funds" as individual customers. Allegations within a lawsuit filed in the Supreme Court of the State of New York styled *Ryan v. Liquid Holdings Group, LLC*, Index No. 156735/2013, further show that the Registration Statement was incorrect. Therein, the plaintiffs alleged that the Registration Statement provided an incorrect number of users of Liquid's software. The number of users indicated in the Registration Statement referred to terminals used by the plaintiffs in their brokerage business. According to the plaintiffs in the lawsuit, Liquid's software did not work, as it was never able to be loaded on the various computers at the brokerage business.

108. The Section 11 Defendants' mistake in terms of reporting inaccurate customer numbers materially influenced investors to purchase Liquid stock, as the incorrect and inflated customer number led investors to inaccurately believe that Liquid's operations were more mature and advanced than they truly were.

109. With proper due diligence, the Section 11 Defendants would have been able to discover the aforementioned related-party transactions and errors with regard to the Company's customers, and either prevented them from occurring or corrected

the Registration Statement so as not to omit material facts relating thereto. But for the Section 11 Defendants' failure to exercise proper and reasonable care in ensuring the accuracy and truthfulness of the Registration Statement, Plaintiffs and the investors they represent would not have been injured. The Section 11 Defendants acted with negligence in connection with their duties relating to the Registration Statement.

**COUNT I**

**Violation of Section 11 of the Securities Act**
**against the Section 11 Defendants**

110. Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein. Notwithstanding anything to the contrary alleged herein, for the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

111. As set forth above, Liquid's Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

112. Liquid's Registration Statement was signed by the Section 11 Defendants (except for Sandler).

113. The Section 11 Defendants (except for Sandler) were directors of or partners in Liquid at the time of the filing of the Registration Statement.

114. The Section 11 Defendants (except for Sandler) were named in the

Registration statement as being or about to become a director of, or person performing similar functions in, Liquid.

115. Sandler was the underwriter with respect to the Liquid common stock offered in the IPO.

116. Plaintiffs and the other members of the Class purchased Liquid common stock in the IPO.

117. Plaintiffs and the other members of the Class were damaged by the Section 11 Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

118. This claim was brought within the applicable statute of limitations.

119. By reason of the foregoing, the Section 11 Defendants have violated Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Class.

## COUNT II

### Violation of Section 15 of the Securities Act against the Section 15 Defendants

120. Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein. Notwithstanding anything to the contrary, for the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

121. Each of the Section 15 Defendants participated in the operation and

management of Liquid at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Liquid's business affairs.

122. Each of the Section 15 Defendants was involved in the day-to-day operations of the Company at the highest levels.

123. Each of the Section 15 Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

124. The Section 15 Defendants were senior officers and directors of Liquid. Due to their positions of control and authority, the Section 15 Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

125. The Section 15 Defendants each signed, or caused to be signed on their behalf, the Registration Statement.

126. The Section 15 Defendants were controlling persons of Liquid under the Securities Act.

127. Liquid's conduct, as alleged herein, constitutes a violation of Section 11 of the Securities Act.

128. The Section 15 Defendants are liable to Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as Liquid, for violations under Section 15 of the Securities Act.

## THE EXCHANGE ACT CLAIMS

129. Separate and apart from the Securities Act claims, Plaintiffs' Exchange Act claims seek to hold the Section 10(b) Defendants, the Scheme Defendant, and Section 20(a) Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements for the purpose of inducing investors to purchase Liquid stock and/or perpetrating a fraudulent scheme or device upon Plaintiffs and other members of the Class.

### A. Defendants' Materially False and Misleading Statements

*July 26, 2013 – Prospectus*

130. On July 26, 2013, Liquid filed its Form 424B4 Prospectus (the Registration Statement) with the SEC announcing the Company's IPO. The Registration Statement was signed by the Section 10(b) Defendants. The Company stated the following about "Related Party Transactions":

> On May 14, 2013, CMK Keller Holdings, LLC sold Mr. Storms 766,466 shares for $5,000,000. We estimated the fair value of the shares sold at $5,780,000. As a result of this sale below fair value, we will record a 2013 share-based compensation expense in the second quarter of 2013.

(2013 Prospectus at 133.)

131. The above statements about related party transactions were materially false and/or misleading. First, the Registration Statement was false or misleading because it misrepresented Storms' loan from CMK as a stock sale. The Company

stated that Keller sold Storms 766,466 shares of Liquid common stock for $5,000,000. In reality, Keller gave Storms 766,466 shares of Liquid common stock in return for a promissory note in the principal amount of $5,000,000 that was later reduced to $1,250,000.

132. Similar to the stock transfer agreement described above, this transaction was material because it indicated that insiders did not believe that the Company's stock was worth $9.00 per share (as represented to the public during the IPO). Had Storms, Keller, or any of the Section 10(b) Defendants truly believed that the Company's stock was worth $9.00 per share, then Storms would not have been able to simply receive $5,000,000 of Liquid stock for no consideration.

133. Next, the Registration Statement was false or misleading because it omitted a pre-IPO agreement whereby Keller and Ferdinand agreed to transfer an additional 732,292 shares of Liquid common stock to an entity controlled by Von Allmen for no cash consideration once the shares were no longer subject to lock-up agreements signed in connection with the IPO.

134. Von Allmen initially purchased 1,722,100 shares of Liquid common stock through the IPO at $9.00 per share. This resulted in a total cost to Von Allmen of $15,498,900. However, because of the stock transfer agreement, Von Allmen received an additional 732,292 shares at no consideration, making his total purchase amount to an acquisition of 2,454,392 shares at an aggregate price of $6.31 per share.

This resulted in an almost 30% discount to the market rate. The failure to disclose this transaction was significant because although the Company represented the value of Liquid shares to be $9 per share, internally, the Company and its chief insiders only valued the shares at $6.31 per share.

135. The materiality of these transactions required the Section 10(b) Defendants to disclose the above transactions accurately (so as not to mislead investors).

*September 9, 2013 – Quarterly Report*

136. On July 26, 2013, Liquid filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 Form 10-Q"). Defendants Storms and Shifrin signed the quarterly report on behalf of the Company.

137. The Company listed its related party transactions in the Q2 2013 Form 10-Q. The list of related party transactions in the Q2 2013 Form 10-Q was materially false and/or misleading. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the report was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen.

138. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

*November 14, 2013 – Quarterly Report*

139. On November 14, 2013, Liquid filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 Form 10-Q"). Defendants Storms and Shifrin signed the quarterly report on behalf of the Company.

140. The Company listed its related party transactions in the Q3 2013 Form 10-Q. The list of related party transactions in the Q3 2013 Form 10-Q was materially false and/or misleading. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the report was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen.

141. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

*March 31, 2014 – Annual Report*

142. On March 31, 2014, Liquid filed its annual report with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2013 (the "2013 Form 10-K"). Defendant Storms signed the annual report on behalf of the Company. The 2013 Form 10-K was also signed by the Section 10(b) Defendants.

143. The Company stated the following about "Related Party Transactions":

> On May 14, 2013, CMK Keller Holdings, LLC sold Mr. Storms 766,466 shares for $5,000,000. We estimated the fair value of the shares sold at $5,780,000. As a result of this sale below fair value, we recorded a 2013 share-based compensation expense in the second quarter of 2013.
>
> * * *
>
> *Stock Transfers to Douglas J. Von Allmen and Others.* In late February of 2014, entities controlled by two of our founders, Brian Ferdinand and Robert Keller, transferred 732,292 shares of our common stock to an entity controlled by Douglas J. Von Allmen and certain other pre-IPO stockholders without the payment of any cash consideration

(2013 Form 10-K at 68, 70.)

144. The description of the Company's related party transactions in the 2013 Form 10-K was materially false and/or misleading. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the report was false or misleading because although it disclosed that Von Allmen received shares, it omitted the fact that the shares were transferred pursuant to a pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen.

145. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

*<u>May 13, 2014 – Quarterly Report</u>*

146. On May 13, 2014, Liquid filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter

ended March 31, 2014 (the "Q1 2014 Form 10-Q"). Defendant Shifrin signed the quarterly report on behalf of the Company.

147. The Company listed its related party transactions in the Q1 2014 Form 10-Q. The list of related party transactions in the Q1 2014 Form 10-Q was materially false and/or misleading. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock.

148. Second, the report was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen.

149. Third, the report omitted a loan between Storms and Ferdinand entered into in March 2014. This loan, as described by the Audit Committee in the September 24, 2015 Form 8-K, entailed Ferdinand giving Storms $1.1 million for the supposed purpose of allowing Storms to satisfy certain tax obligations related to restricted stock units of Liquid stock Storms received from Liquid in December 2012.

150. This loan should have been disclosed by the Section 10(b) Defendants because it further reflected the fact that, internally, the Section 10(b) Defendants considered Liquid's stock to be less valuable than it supposedly was. Ferdinand's agreement to satisfy Storms' tax obligations was a pre-condition to Storms accepting the restricted stock units as part of his compensation for serving as CEO. Storms'

receipt of money from Ferdinand for the purpose of satisfying tax obligations evidences the fact that Storms valued Liquid's stock as being less valuable than publicly stated.

151. Fourth, the report also omitted a second loan in favor of Storms. This second loan entailed D&L Partners giving $130,000 to Storms in May 2014 to buy shares of Liquid stock in the open market. This loan should have been disclosed to investors because it further evidenced that Storms did not consider Liquid's stock as being valuable enough to buy with his personal funds. Moreover, the timing between Storms' loan from Ferdinand and D&L Partners suggests that Storms intended to purchase Liquid stock so as to benefit from the Section 10(b) Defendants' scheme to continue artificially inflating the price of Liquid stock, ultimately being able to sell the stock at a higher price and potentially repay Ferdinand and/or other creditors.

152. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

*May 15, 2014 – Prospectus*

153. On May 15, 2014, Liquid filed a Form 424B4 Prospectus ("2014 Prospectus") announcing a secondary offering at $1.25 a share, a 45% discount to the then-current market price of $2.30 per share.

154. The Company listed its related party transactions and included the following:

> On May 14, 2013, CMK Keller Holdings, LLC sold Mr. Storms 766,466 shares for $5,000,000. We estimated the fair value of the shares sold at $5,780,000. As a result of this sale below fair value, we recorded a 2013 share-based compensation expense in the second quarter of 2013.

(2014 Prospectus at 111.)

155. The Company's statements about related party transactions in the 2014 Prospectus were materially false and/or misleading. First, the prospectus failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the prospectus was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen. Third, the prospectus failed to disclose Storms' loans from Ferdinand and D&L Partners in March and May of 2014.

156. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

*July 31, 2014 – Press Release*

157. Liquid issued a press release disclosing its second quarter earnings results for fiscal year 2014 on July 31, 2014 (the "Q2 2014 Press Release"). Liquid filed a copy of the Q2 2014 Press Release as an exhibit to a Form 8-K filed with the SEC on July 31, 2014. Storms, Liquid's then-current CEO, is quoted in the Q2 2014 Press Release. Shifrin signed the Form 8-K filed with the SEC that attached the Q2

2014 Press Release as an exhibit. Storms and Shifrin made and/or were responsible for the statements within the Q2 2014 Press Release.

158. The press release stated in pertinent part:

> Software services revenue increased during the second quarter of 2014 to $1.5 million, or 131%, from $0.7 million in the second quarter of 2013. GAAP net loss for the second quarter of 2014 decreased to $6.3 million, or $0.15 per basic and diluted share, compared to a net loss of $21.7 million, or $1.04 per basic and diluted share, in the second quarter of 2013. The net loss for the second quarter was due primarily to compensation expense of $2.3 million (including $0.3 million of share-based compensation), depreciation and amortization of $1.8 million, and computer related and software development expense of $1.4 million. Depreciation and amortization was predominantly for amortization of acquisition-related intangible assets.
>
> . . .
>
> [Annual Contract Value ("ACV")] totaled $5.45 million at the end of the second quarter of 2014, an increase of 4.2% from $5.23 million at the end of the first quarter of 2014 and 219% from $1.71 million year-over-year. ACV is a non-GAAP measure and represents the estimated contract value of subscription payments payable to the Company during the next twelve months (or, in the case of subscription contracts where the remaining contract term is less than twelve months, the remaining value of such contracts) pursuant to subscription contracts existing at the end of the quarter for which Annual Contract Value is reported, including contracts pursuant to which the Company is currently generating no revenue because its product has not yet been deployed to the customer. For more information about ACV, see "About Annual Contract Value" below.
>
> * * *
>
> Most of Liquid's revenues are generated from subscription contracts, which are paid monthly and typically have a minimum term of one year, with revenues recognized ratably over the term of the subscription contract. Management uses ACV as a basis for planning and forecasting

> core business activity for future periods and believes it is a helpful indicator of potential future revenue. However, the Company cautions readers that the Company's presentation of ACV may not be comparable to similar measures as disclosed by other companies, because other companies may calculate these measures differently. Additionally, our actual revenue may be lower or higher than ACV. ACV is a forward-looking estimate.

(Q2 2014 Press Release.)

159. The above statements about QuantX and Liquid's anticipated revenue are materially false or misleading because during June 2014, certain members of Liquid's management became aware that QuantX was experiencing significant liquidity issues, which consequently meant that QuantX was unable to pay Liquid past due amounts for products and/or services rendered. In particular, QuantX's insolvency precluded QuantX from paying in full Liquid's outstanding bills in the aggregate amount of approximately $1,200,000 as of June 30, 2014. Notwithstanding, the Company continued to include QuantX as a source of future revenue when forecasting its ACV at $5.45 million in addition to touting the Company's increase in software services revenue. By including QuantX in its revenue projections and failing to disclose to investors that QuantX was unable to pay, Liquid misrepresented the financial and operational health of the Company to investors.

160. This misrepresentation was material because QuantX represented the majority of Liquid's revenues. QuantX's financial condition, liquidity, and results

of operations were closely tied to and significantly impacted Liquid's performance. Indeed, Liquid specifically indicated in the September 24, 2015 Form 8-K that QuantX's liquidity issues could have a material adverse effect on the Company's expected revenues. QuantX's importance to Liquid rendered the Section 10(b) Defendants' omissions material. Additional evidence that the above information was material is the fact that once the Company disclosed to investors that QuantX was unable to pay Liquid, Liquid's stock declined by 45% on unusually heavy volume on December 24, 2015 (from $0.74 per share at close on December 23, 2014, to $0.40 per share at close on December 24, 2014).

*July 31, 2014 – Earnings Conference Call*

161. On July 31, 2014, Defendants Storms and Shifrin held an earnings conference call on behalf of the Company (the "Q2 2014 Earnings Call"). Shifrin discussed the Company's financial results for the quarter. Shifrin stated in pertinent part:

> Now I would like to cover some key financial highlights. **Annual contract value rose 4.2% quarter-over-quarter to $5.45 million from $5.23 million at the end of the first quarter.** We grew our client base to 130 customers at June 30th, of which 97 contributed to second quarter revenue and 33 who are under contract and will generate revenue in future quarters. This represents a 9.2% increase in total customers compared to March 31, 2014 when we had 119 customers, 76 of which contributed to revenue in the first quarter of 2014 and 43 were under contract.

(Q2 2014 Earnings Call.)

162. Storms also made comments in reference to the Company's future revenue when asked about it on the Q2 2014 Earnings Call. The relevant question and response state in pertinent part:

**Peter Lowry - JMP Securities**

Hi, great. Thanks. Can you talk a little bit about the customer hedge you had in the quarter versus your own expectations? And then, I guess maybe coupled with that, sort of the health of the pipeline outside of the customers added under contract?

**Brian Storms**

Sure. Hi, Peter. This is Brian. I'll answer your question and I'll ask Robert O'Boyle if he wants to expand on that. One of the -- they are only real challenge and it was a pretty substantial challenge we had going into this quarter was, as a public company our financials obviously are quite transparent. And we had some real challenges with what was a robust pipeline going into the second quarter and in closing contracts we ended up with 20 new clients in the quarter.

And that was really a result of our financial situation of our balance sheet. People were reluctant to sign contracts with us, early in the quarter when they knew we were out on a potential capital raise and strengthening the balance sheet. After all we're selling to Hedge Funds, Hedge Funds that analyze companies and given the circumstances that we found ourselves in towards the end of Q1, it put a lot of pressure on Robert and his sales team to close transactions.

**So the pipeline was very healthy going into Q2. It's even healthier going into Q3**, which we'll talk about. But that really created a little bit of a headwind for us -- substantial headwind for us. And when we closed the secondary offering on May 20th and obviously made substantial strengthening of the balance sheet, we're able to close out the quarter with some fairly strong momentum including some very notable wins for us. So, it was nothing more than that, it was really just the headwinds of our balance sheet.

> Going into Q3, we feel very optimistic about our pipeline. The strength of our pipeline not only for Q3, but for the balance of the year, and I would expect this to get back to a normal cadence when it comes to the type of deal count that we've added in subsequent quarter. So that sort of what we're up against in Q2.

(Q2 2014 Earnings Call.)

163. The above statements about QuantX and Liquid's anticipated revenue were materially false or misleading because they materially misled investors about Liquid's ability to recover monies owed from QuantX. As stated above, Liquid's management knew that QuantX was unable to pay Liquid material amounts of money owed for products and/or services rendered. Notwithstanding, the Section 10(b) Defendants continued to misrepresent Liquid's financial health and mislead investors to believe that Liquid was operationally sound. For these reasons and those stated previously, this misrepresentation and/or omission was material.

164. The Q2 2014 Earnings Call was also misleading because, notwithstanding the Section 10(b) Defendants' knowledge of QuantX's inability to pay, Storms touted the Company's third quarter pipeline by stating that the third quarter would be even better than the second. Without the omitted information, *i.e.*, that QuantX would be unable to pay going forward, investor were led to believe that the Company was not only financially sound but also improving. The Section 10(b) Defendants allowed investors to rely on this information even though they were obligated to prevent and/or correct these statements.

*August 14, 2014 – Quarterly Report*

165. On August 14, 2014, Liquid filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 Form 10-Q"). Defendant Shifrin signed the quarterly report on behalf of the Company.

166. The Company stated that the ACV as of June 30, 2014, was $5.45 million.

167. Additionally, Liquid made the following disclosures about its revenue:

> ***Revenues***
>
> Software services revenue was $1.5 million during the three months ended June 30, 2014, an increase of $0.9 million from $0.7 million during the three months ended June 30, 2013 (the "prior period"). The increase was due primarily to an increase in the number of customers and units contributing to revenue during the current period. Customers and units contributing to revenue totaled 97 and 679, respectively, at June 30, 2014 compared to 23 and 385, respectively, at June 30, 2013. QuantX and our affiliated customers accounted for 63% of our software services revenue during the three months ended June 30, 2014, and 3% of our customers and 60% of our units contributing to revenue at June 30, 2014. **During the fourth quarter of 2013, we entered into a $1.0 million annual contract with QuantX for an enhanced version of our LiquidMetrics® platform, and we started charging customers for their use of market data services, both of which added to the increase in software services revenue** during three months ended June 30, 2014. During the second quarter of 2014, we entered into a $250,000 annual contract for our LiquidMetrics® platform that also contributed to the increase in software services revenue during the three months ended June 30, 2014. Revenue generated from market data services totaled $0.1 million for the three months ended June 30, 2014.

(Q2 2014 Form 10-Q, at 25.)

168. The above statements about QuantX and Liquid's anticipated revenue were materially false or misleading because, as stated previously, the Section 10(b) Defendants knew that QuantX was unable to pay Liquid significant amounts of money owed for products and/or services rendered. Notwithstanding, the Section 10(b) Defendants continued to include QuantX as a source of future revenue when forecasting its ACV at $5.45 million as well as included QuantX in the Company's revenue generally. By including QuantX in its revenue projections and failing to warn investors that QuantX was unable to pay, Liquid misrepresented the health of the Company to investors. For the reasons stated previously, these misrepresentations and/or omissions were material.

169. Additionally, Liquid's Q2 2014 Form 10-Q was materially misleading because it incorporated outdated, stale cautionary language. The Q2 2014 Form 10-Q incorporated by reference the cautionary language contained within the 2013 Form 10-K, which stated in pertinent part as follows:

> We currently have a limited number of customers, most of which to date have been generated as a result of pre-existing relationships of these customers with our founders and entities affiliated with them. We may not be successful in attracting new customers. In addition, the loss of or events affecting one or more of our customers could materially and adversely affect us and cause our stock price to decline significantly.

(2013 Form 10-K at 20.)

170. This risk warning materially misled investors because it presented the risk of losing customers as a mere potentiality when, in reality, the risk had already materialized in a meaningful manner. This misrepresentation was material for the same reasons discussed above.

171. The Q2 2014 Form 10-Q also materially misled investors with respect to Liquid's related-party transactions. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the report was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen. Third, the report failed to disclose Storms' loans from Ferdinand and D&L Partners in March and May of 2014.

172. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

173. Finally, the Q2 2014 Form 10-Q was also materially misleading given that it included certifications by Storms and Shifrin pursuant to the Sarbanes-Oxley Act ("SOX"). These certifications indicated that Storms and Shifrin had both reviewed the Q2 2014 Form 10-Q and that it was materially accurate and not misleading. Specifically, Storms and Shifrin each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Liquid Holdings Group, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal

quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

   b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q2 2014 Form 10-Q, Exs. 31.1 & 31.2.)

174. Given the false and/or misleading nature of the statements in the Q2 2014 Form 10-Q described above, Storms' and Shifrin's certifications were false and/or materially misleading. These omissions and/or misrepresentations were material to Liquid's investors because investors would have declined to purchase Liquid's stock had they known that the Q2 2014 Form 10-Q contained material misrepresentations and/or omissions.

*October 30, 2014 – Press Release*

175. Liquid issued a press release disclosing its third quarter earnings results for fiscal year 2014 on October 30, 2014 (the "Q3 2014 Press Release"). Liquid filed

a copy of the Q3 2014 Press Release as an exhibit to a Form 8-K filed with the SEC on October 30, 2014. Storms is quoted within the Q3 2014 Press Release. Storms also signed the Form 8-K filed with the SEC that attached the Q3 2014 Press Release as an exhibit. Storms made and/or is responsible for the statements within the Q3 2014 Press Release.

176. The press release stated in pertinent part:

**Financial Highlights for the Third Quarter of 2014**

- Software services revenue increased 103% year-over-year to $1.5 million
- Basic and diluted loss per share of $(0.13)
- Non-GAAP adjusted basic and diluted loss per share of $(0.09)
- Annual Contract Value ("ACV") rose 56% to $5.0 million at September 30, 2014 as compared to September 30, 2013
- Total contracted software units rose 38% from September 30, 2013 to 781 units

* * *

"The third quarter was a transitional period for Liquid. We took a number of actions focused on building a stronger foundation to position the Company for long-term growth. These include strengthening our ability to successfully compete and win larger, independent fund managers, which provide more stability and offer a larger total revenue opportunity," said Brian Storms, CEO of Liquid.

* * *

**Third Quarter 2014 Results**

**Software services revenue increased during the third quarter of 2014 to $1.5 million**, or 103%, from $0.7 million in the third quarter of 2013. Net loss for the third quarter of 2014 improved to $8.1 million,

**or $0.13 per basic and diluted share**, compared to a net loss of $12.2 million, or $0.52 per basic and diluted share, in the third quarter of 2013. The net loss for the third quarter was due primarily to compensation expense of $3.4 million (including $1.1 million of share-based compensation), depreciation and amortization of $1.8 million, and computer-related and software development expense of $1.4 million. Depreciation and amortization was predominantly for amortization of acquisition-related intangible assets.

* * *

**ACV totaled $5.0 million at the end of the third quarter of 2014.** This compares to $5.5 million at the end of the second quarter of 2014 and $3.2 million at the end of the third quarter of 2013. ACV is a non-GAAP measure and represents the estimated contract value of subscription payments payable to the Company during the next twelve months (or, in the case of subscription contracts where the remaining contract term is less than twelve months, the remaining value of such contracts) pursuant to subscription contracts existing at the end of the quarter for which Annual Contract Value is reported, including contracts pursuant to which the Company is currently generating no revenue because its product has not yet been deployed to the customer. For more information about ACV, see "About Annual Contract Value" below.

**Liquid had 129 customers as of September 30, 2014, consisting of 95 customers contributing to GAAP revenue** and 34 customers under contract and expected to contribute to future GAAP revenue. This compares to 130 customers as of June 30, 2014 consisting of 97 customers contributing to GAAP revenue and 33 customers under contract and expected to contribute to future GAAP revenue, and 48 customers as of September 30, 2013 consisting of 27 customers contributing to GAAP revenue and 21 customers under contract and expected to contribute to future GAAP revenue.

(Q3 2014 Press Release.)

177. The above statements about QuantX and Liquid's anticipated revenue were materially false and/or misleading because they omitted the fact that QuantX

was unable to pay Liquid substantial monies owed for past products and/or services rendered, as described above. Furthermore, as later revealed by the Company, Liquid's true financial figures were as follows (once accounting for the improper, premature recognition of revenue from QuantX): Software Services Revenue of $213,742; Gross Loss of ($515,878); and Basic and Diluted loss per share of ($0.16).

178. These misrepresentations were material for the same reasons described above. The materiality of these misrepresentations and/or omissions is evident in the fact that Liquid restated these financial figures and, according to FASB accounting standards, restatements are only issued to correct material errors in financial statements.

179. The 2014 Q3 Press Release was also misleading because it misrepresented the number of revenue-generating customers Liquid had as of September 30, 2014. While the 2014 Q3 Press Release represented that Liquid had 95 customers contributing to revenue, the Company stated in its May 28, 2015 Press Release that the true number of revenue-generating customers at this point in time was only five (5).

180. The significant discrepancy between what was represented and what was actually true renders this misrepresentation material, especially in light of the fact that Liquid was a relatively new publicly-traded company with a limited customer base. Had investors been told that Liquid only had five revenue-generating

customers, they would have considered this information when deciding whether to purchase Liquid stock.

*October 30, 2014 - Earnings Conference Call*

181. On October 30, 2014, Defendant Storms held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the third quarter of fiscal year 2014 (the "Q3 2014 Earnings Call").

182. During the Q3 2014 Earnings Call, Defendant Storms responded to a question regarding the QuantX churn and the relationship and future with QuantX. Specifically, Storms stated, in pertinent part:

> **George Sutton - Craig-Hallum Capital Group**
>
> Thank you. Brian, just help me understand conceptually the QuantX situation. So they're taking dollars away from your clients or the clients that are working with your software and they're giving them to clients that aren't part of your software. Is that what you're trying to explain?
>
> **Brian Storms**
>
> No. And I appreciate you're asking the question. I was hopeful we could delve into that a little bit more. And as I think you know and everyone else knows we don't play a role in the management of QuantX or in any of the decisions that are made about capital allocation or for that matter anything about the strategy. But just to review quickly they are a fund of funds, their chosen segment is emerging funds. It had a very, very solid track record which is why they've been able to continually raise new capital. They're in a very unique sector of the market place. There are few competitive funds out there that have been able to achieve the results in that emerging fund category. But a byproduct of that segment and that decision is that there's a fair amount

> of churn as we're learning because they're able to actively manage risk and trading activities in real time amongst their client base. They're able to make allocation decisions much quicker than your average fund of funds that doesn't have the benefit of that technology. So, it's sort of built into their model that there are going to be periods and the third quarter was one of those periods where there'll be a lot more churn where they're either not going to allocate money to some of their managers or they're going to take money away from manager A and give it to manager B because of performance. And there are going to be periods as we've seen in previous quarters where they may add 10, 15, 20, 25 new managers because of the way in which they're managing their performance. The net of that is, is as we think about that relationship going forward and God knows we think about it every day. We are going to have to really reflect the variances in how that business affects our business versus the more traditional independent clients that we're pursuing far more aggressively. So, it's all within the control of QuantX to make those allocation decisions. I also want to point out that one of the things that we've been trying to do throughout the last year is that when QuantX allocates capital and that manager chooses to use some or all of our software, we go to great lengths to make certain that they're familiar enough with the software that they use, if there is other assets being managed by alternative software products. And we have been quite successful in many instances where they start with the software to manage the allocated capital from QuantX and then they quickly evolve into using their software across their whole business which creates a lot more persistency for us, but that is going to continue to be a factor in our business going forward. And as I said it's very hard to predict with any accuracy what each quarter is going to look like. **There could large additions and there could be subtractions on a regular basis with QuantX going forward.**

(Q3 2014 Earnings Call.)

183. The above statements about QuantX and Liquid's anticipated revenue were materially false and/or misleading because, as discussed above, they omitted the material fact that QuantX was unable to pay Liquid significant amounts of

monies owed for past products and/or services rendered and, going forward, would not be able to contribute to revenue.

*November 14, 2014 – Quarterly Report*

184. On November 14, 2014, Liquid filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 Form 10-Q"). Kent signed the quarterly report on behalf of the Company. Storms was CEO of Liquid at the time of the Q3 2014 Form 10-Q.

185. The Q3 2014 Form 10-Q listed Software Services Revenue of $1,485,007; Gross Profit of $755,387; and Basic and Diluted loss per share of ($0.13).

186. The Company listed its ACV at $5.046 million as of September 30, 2014.

187. Liquid also listed its number of customers contributing to revenue at 95 as of September 30, 2014.

188. Additionally, the Company added the following warning language to its Q3 2014 Form 10-Q:

> While QuantX represents a substantial percentage of our revenues and outstanding accounts receivable, they have historically settled their accounts with the Company in full. However, QuantX's business results are highly tied to the performance of their investment managers and the amount of capital under management. This can cause QuantX's revenues and cash flows, at times, to be quite variable. As a result, their

> payments to the Company can also be quite variable in amounts and timing. As QuantX's results are highly tied to their performance in the marketplace, there can be no assurance that future payments to the Company will be made on a timely basis or in full.

(Q3 2014 Form 10-Q at 12.)

189. The Company also incorporated the Company's risk warnings from the 2013 Form 10-K by reference, which stated in pertinent part:

> We currently have a limited number of customers, most of which to date have been generated as a result of pre-existing relationships of these customers with our founders and entities affiliated with them. We may not be successful in attracting new customers. In addition, the loss of or events affecting one or more of our customers could materially and adversely affect us and cause our stock price to decline significantly.

(2013 Form 10-K, at 20.)

190. The above statements about QuantX and Liquid's anticipated revenue were materially false and/or misleading because, as discussed above, they omitted the material fact that QuantX was unable to pay Liquid significant amounts of monies owed for past products and/or services rendered and, going forward, would not be able to contribute to revenue. Furthermore, even the Company's added warning language about QuantX in particular failed to convey the truth – that QuantX was already unable to pay Liquid the money it owed; in other words, the risk Liquid presented to investors as a mere potentiality had in fact already transpired and materially impacted the Company in a materially negative manner.

191. Further, the Company's disclosure about its revenue-generating customers as of September 30, 2014 was also materially misleading. As already explained above, investors were materially misled when told that the Company had 95 revenue-generating customers as opposed to the true figure of five.

192. The Q3 2014 Form 10-Q also misrepresented the Company's related-party transactions. First, the report failed to disclose the true facts about the Company's mischaracterization of Storms' loan from CMK concerning $5,000,000 of Liquid's stock. Second, the report was false or misleading because it omitted the pre-IPO stock transfer agreement between Keller, Ferdinand, and Von Allmen. Third, the prospectus failed to disclose Storms' loans from Ferdinand and D&L Partners in March and May of 2014. Fourth, in addition to the other loans, Storms received a loan from D&L Partners in October 2014 for $1.1 million which Storms purportedly used to repay the March 2014 loan from Ferdinand.

193. For the reasons stated above, these transactions were material and should have been disclosed fully and accurately.

194. Finally, in connection with Liquid's Q3 2014 Form 10-Q, Defendant Storms certified pursuant to SOX that he reviewed the Q3 2014 Form 10-Q for material misstatements and that the contents of the Q3 2014 Form 10-Q was materially accurate. Specifically, Storms certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Liquid Holdings Group, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

   b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q3 2014 Form 10-Q, Exs. 31.1 & 31.2.)

195. Given the false and/or misleading nature of the statements in the Q2 2014 Form 10-Q described above, Storms' certification was false and/or materially misleading. These omissions and/or misrepresentations were material to Liquid's investors because investors would have declined to purchase Liquid's stock had they known that the Q3 2014 Form 10-Q contained material misrepresentations and/or omissions.

## B. The Truth Emerges Through Partial Disclosures While Defendants Continue to Issue False Assurances

*December 23, 2014 – Form 8-K & Press Release*

196. On December 23, 2014, post-market, Liquid filed a current report with the SEC on Form 8-K ("December 23, 2014 Form 8-K") announcing that the Company was suspending services to QuantX and terminating the consulting agreement with Ferdinand. The Company stated in pertinent part:

> On December 23, 2014, Liquid Holdings Group, Inc. (the "Company") notified Ferdinand Trading LLC ("Ferdinand Trading") and Mr. Brian Ferdinand ("Ferdinand"), a co-founder and former director and officer of the Company, of the Company's termination of the Amended and Restated Consulting Agreement (the "Consulting Agreement"), dated October 16, 2014, between the Company and Ferdinand Trading. Pursuant to the Consulting Agreement, Ferdinand Trading was obligated to make Mr. Ferdinand available to the Company to provide services requested of him by the Company, including assisting with business development efforts; developing strategy for product development, marketing, partnerships and mergers and acquisitions; and providing support to the sales and marketing team, including client introduction. The Company has terminated the Consulting Agreement, effective immediately, as a result of the breach by Ferdinand Trading and Mr. Ferdinand of certain of their obligations under the Consulting Agreement and related agreements.
>
> Concurrently with the termination of the Consulting Agreement, the Company has taken certain other actions relating to Mr. Ferdinand, certain entities affiliated with him, QuantX Management, LLP (together with its affiliates, "QuantX") and certain other parties.
>
> * * *
>
> Concurrently with the Company's termination of the Consulting Agreement as discussed in Item 1.02 of this Form 8-K above, the Company has taken certain other actions as described in this Item 8.01.

First, the Company has notified QuantX that QuantX is delinquent in payments owed to the Company in the aggregate amounts of approximately $1.4 million pursuant to two technology services agreements and approximately $325,000 in additional delinquent payments, and has demanded that QuantX pay such amounts owing to the Company immediately. Further, in connection with such notice to QuantX, the Company has notified QuantX of the Company's intention to suspend QuantX's access to the Company's services on January 8, 2015 (with the Company reserving its rights to suspend such services sooner). The Company has also separately delivered a notice to QuantX declaring the unpaid principal amount of a term note and related obligations in the aggregate amount of approximately $244,000 owed by QuantX to the Company to be immediately due and payable as a result of the failure to make timely payments of principal and interest to the Company in accordance with the terms of the note.

The Company has also delivered a demand notice (i) to Ferdinand Capital, LLC ("Ferdinand Capital") declaring the unpaid principal amount of a term note and related obligations in the aggregate amount of approximately $111,000 owed by Ferdinand Capital to the Company to be immediately due and payable as a result of the failure to make timely payments of principal amounts and accrued interest to the Company in accordance with the terms of the note and (ii) to another individual declaring the unpaid principal amount of a term note and related obligations in the aggregate amount of approximately $307,000 owed by that other individual to the Company to be immediately due and payable as a result of the failure to make timely payments of principal amounts and accrued interest to the Company in accordance with the terms of the note.

There can be no assurance that QuantX, Mr. Ferdinand and the other parties to whom we have delivered demand notices have or will have the financial means to satisfy their obligations to us.

For the quarter ended September 30, 2014, **QuantX accounted for 61% of Liquid's software services revenue, while managers to whom QuantX allocated investment capital represented an additional 34% of software services revenue.**

> As a result of our termination of our relationship with QuantX, we expect our revenue, at least in the near term and possibly for the intermediate and longer term, to be significantly reduced. As we announced on our earnings call for the quarter ended September 30, 2014, we had previously begun to focus our client development efforts on generating new customers other than through our relationship with QuantX. We cannot assure you that the Company will be successful in these efforts.

(December 23, 2014 Form 8-K.)

197. In connection with Liquid's Form 8-K filed on December 23, 2014, the Company also issued a press release ("December 23, 2014 Press Release"). The press release stated in pertinent part:

> "We are disappointed by the failure of QuantX to meet its contractual obligations. Since our inception, QuantX has been a valuable and important relationship that helped accelerate the growth of our client base as well as our understanding of the intricate workflows between managed account platforms and single-manager hedge funds," said Brian Storms, CEO of Liquid Holdings Group. "QuantX accounts for a significant portion of our revenue."
>
> For the quarter that ended September 30, 2014, QuantX accounted for 61% of Liquid's software services revenue, **while managers to whom QuantX allocated investment capital represented an additional 34% of software services revenue.** Liquid expects that there will be no interruption of services to the managers having a QuantX allocation, though no assurance can be given that they will continue as our customers.
>
> **Liquid currently provides services to 25 customers independent of the QuantX relationship, of which 7 were billed in the current quarter and another 18 were in various stages of onboarding.** While the Form 8-K identifies changes in revenue and certain relationships, the suspension has no impact on any other Liquid Holdings clients or the company's daily operations.

> Liquid also notified Ferdinand Trading LLC and Brian Ferdinand, a co-founder and former director of Liquid, of the company's termination of a consulting agreement between the parties. Liquid also delivered a demand notice to Ferdinand Capital LLC declaring the unpaid principal amount of a term note and related obligations owed by Ferdinand Capital to be immediately due and payable.

(December 23, 2014 Press Release.)

198. This corrective disclosure partially revealed the truth about QuantX's inability to meet its financial obligations, that QuantX was winding up operations, that QuantX would no longer be contributing to Liquid's revenue, and the true current number of Liquid customers. Ferdinand and QuantX were integral in making Liquid look like a legitimate business with more customers than it really had. Thus, these statements partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

199. On this news, shares of Liquid declined $0.34 from $0.74 per share at close on December 23, 2014, to $0.40 per share at close on December 24, 2014, a nearly 46% drop, on unusually heavy volume.

200. Storms' statements in the December 23, 2014 Press Release were also materially false or misleading because the Section 10(b) Defendants already knew as of June 24, 2014 that QuantX was experiencing significant liquidity issues and likely would be unable to pay the money it owed Liquid for past products and/or services rendered.

201. This misrepresentation was material because, as explained previously, it prevented investors from evaluating management's internal controls over the Company as well as the integrity of management itself. Had investors known that management had known since June 2014 that QuantX was unable to pay Liquid, investors would have been able to sell their stock immediately instead of waiting until bankruptcy.

*<u>January 8, 2015 – Form 8-K & Press Release</u>*

202. On January 8, 2015, post-market, Liquid filed a current report with the SEC on Form 8-K ("January 8, 2015 Form 8-K") updating investors on the status of its relationship with QuantX. The Company stated in pertinent part:

> As previously disclosed in the Company's 8-K dated December 23, 2014 (the "December 23 8-K"), the Company has notified QuantX Management, LLP (together with its affiliates, "QuantX") that QuantX is delinquent in payments owed to the Company in the aggregate amount of approximately $1.4 million pursuant to two technology services agreements and approximately $325,000 in additional delinquent payments, and has demanded that QuantX pay such amounts owing to the Company immediately. As also previously disclosed in the December 23 8-K, Liquid has also separately delivered a notice to QuantX declaring the unpaid principal amount of a term note and related obligations in the aggregate amount of approximately $244,000 owed by QuantX to Liquid to be immediately due and payable as a result of the failure to make timely payments of principal and interest to Liquid in accordance with the terms of the note.
>
> As of January 7, 2015, the Company has not received any payment from QuantX in response to the demand letters it issued. While Liquid has not received any formal communication from QuantX as to its status, **Liquid's discussions with QuantX representatives indicate that QuantX is in the process of winding down and has limited**

> **operating cash left.** Based on these discussions, Liquid believes that QuantX may not have the financial means to satisfy its obligations to the Company, and at this time expects that it may need to write off all or a significant portion of these obligations, which in the aggregate total approximately $2 million. The Company, with the assistance of counsel, intends to take appropriate steps in an effort to collect these obligations, although there can be no assurance that the Company will be successful in doing so.

(January 8, 2015 Form 8-K.)

203. In connection with Liquid's Form 8-K filed on January 8, 2015, the Company also issued a press release. The press release stated in pertinent part:

> As announced on December 23, 2014, QuantX had become delinquent on payments owed to Liquid pursuant to services agreements and certain notes receivable contracted between the two firms. As of January 7, 2015, Liquid has not received any payment from QuantX in response to the demand letters it issued. While the company has not received any formal communication from QuantX as to its status, the company's discussions with QuantX representatives indicate that QuantX is in the process of winding down and has limited operating cash left. Based on these discussions, Liquid believes that QuantX may not have the financial means to satisfy its obligations to the company, and at this time expects that it may need to write off all or a significant portion of these obligations, which in the aggregate total approximately $2 million.
>
> "We are disappointed by the failure of QuantX, which drove much of our early growth and gave us a great launch point for the business," said Brian Storms, CEO of Liquid Holdings Group. "Despite this loss, our core strategic focus does not change. We are deeply committed to providing our clients with the mission-critical tools and great user experience they need to grow, as well as winning new independent hedge funds as customers seeking a better, less costly and more comprehensive integrated solution. We will continue to expand on the solid foundation we began building in 2014—our recent wins have demonstrated the acceptance of our dynamic approach and will

> contribute significantly to our ability to attract new clients throughout 2015."
>
> "Our balance sheet remains strong and our continued focus on expense reductions in non-critical areas provides us with a substantial runway to rebuild our revenue base and grow with our customers," added Peter Kent, CFO. "Based on our initial estimates, Liquid had a cash balance of $24 million as of December 31, 2014 and we continue to strive to reduce cash operating expenses to an annual run rate below $18 million. In addition, we intend to make every effort to collect the monies due from QuantX, including taking all appropriate legal action."

(January 8, 2016 Press Release.)

204. This corrective disclosure partially revealed the truth about QuantX's inability to meet its financial obligations, that QuantX was winding up operations, and that QuantX would no longer be contributing to Liquid's revenue. Ferdinand and QuantX were integral in making Liquid look like a legitimate business with more customers and revenue than it really had. Thus, these statements partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

205. On this news, shares of Liquid declined from $0.31 per share at close on January 8, 2015, to $0.29 per share at close on January 9, 2015, a nearly 6.5% drop, on unusually heavy volume.

206. Storms' statements in the December 23, 2014 Press Release were also materially false or misleading because the Section 10(b) Defendants already knew as of June 24, 2014 that QuantX was experiencing significant liquidity issues and

likely would be unable to pay the money it owed Liquid for past products and/or services rendered. This misrepresentation was material because, as explained previously, it prevented investors from evaluating management's internal controls over the Company as well as the integrity of management itself. Had investors known that management had known since June 2014 that QuantX was unable to pay Liquid, investors would have been able to sell their stock immediately instead of waiting until bankruptcy.

*February 24, 2015 – Press Release*

207. On February 24, 2015 prior to the market opening, the Company issued a press release announcing the delay in earnings release and conference call for the fourth quarter and full year 2014. The press release stated in pertinent part:

> Liquid expected a more definitive resolution of specific QuantX uncertainties and related issues prior to the earnings release, in accordance with its previous public filings. Due to the lack of a resolution, Liquid will need additional time to finalize its financial results for the fourth quarter and full year 2014.

(February 24, 2015 Press Release.)

208. This corrective disclosure partially revealed the truth about Liquid's questionable status as a going concern moving forward. This disclosure revealed that QuantX was an integral part in making Liquid look like a legitimate business. Defendants had known since June 2014 that QuantX was unable to pay but continued to delay disclosure as much as possible in an attempt to further deceive investors.

Thus, this disclosure partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

209. On this news, shares of Liquid declined from $0.35 per share at opening on February 24, 2015, to $0.31 at close on January 9, 2015, a nearly 11.5% drop, on unusually heavy volume.

*<u>March 31, 2015 – Form NT 10-K</u>*

210. On March 31, 2015, post-market, Liquid filed a notification of late filing on Form NT 10-Q ("March 31, 2015 Form NT 10-Q") with the SEC. The Form was signed by Kent on behalf of the Company. The Company stated that the reason for the late filing was, in pertinent part:

> The Audit Committee of the Company's Board of Directors, with the assistance of outside legal counsel, is conducting an investigation into certain issues raised by counsel to one of our shareholders, including allegations about the Company's former senior management. Because of the timing of this investigation, the Company was unable to deliver certain material to its independent registered public accounting firm with sufficient time for them to complete their audit of the Company's 2014 consolidated financial statements prior to the filing deadline for the Annual Report. The Company intends to file the Annual Report as soon as practicable, and expects to do so on or before the fifteenth calendar day following the due date of the Annual Report.
>
> * * *
>
> The Company expects to report a net loss of approximately $48.8 million for the year ended December 31, 2014 compared to approximately $46.6 million for the year ended December 31, 2013. This expected increase in our net loss will be due primarily to non-cash charges recorded in 2014 related to the impairment of our goodwill and

> bad debts on uncollectible receivables offset, in part, by a decrease in share-based compensation.

(March 31, 2015 Form NT 10-K.)

211. This corrective disclosure partially revealed the truth about Liquid's questionable status as a going concern moving forward and the Audit Committee's investigation into the Company. This disclosure revealed that the Company had to continually take additional losses due to impairment of the Company's goodwill that it acquired prior to the IPO. Further, the details the Company offered about the Investigation partially revealed to investors that Liquid was a sham and that the Company had been misleading investors from the beginning. Thus, this disclosure partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

212. On this news, shares of Liquid declined from $0.26 per share at close on March 31, 2015, to $0.23 per share at close on April 1, 2015, an 11.5% drop, on unusually heavy volume.

*May 18, 2015 – Form NT 10-Q*

213. On May 18, 2015, Liquid filed a notification of late filing on Form NT 10-Q ("May 18, 2015 Form NT 10-Q") with the SEC. The Form was signed by Kent on behalf of the Company. The Company stated in pertinent part:

> As previously reported, the Audit Committee of the Company's Board of Directors, with the assistance of outside legal counsel, is conducting an investigation into certain issues raised by counsel to one of our

> shareholders, including allegations about the Company's former senior management. Because of the timing of this investigation, the Company remains unable to deliver certain material to its independent registered public accounting firm for them to complete their audit of the Company's 2014 consolidated financial statements. Due to the impact of the above matters on the presentation of the Company's financial statements in its Quarterly Report, the Company is unable to file the Quarterly Report until the audit of the Company's 2014 consolidated financial statements is completed. The Company intends to file the Quarterly Report as soon as practicable, but at this time, the Company is unable to represent that Quarterly Report will be filed on or before the fifth calendar day following its prescribed due date.
>
> * * *
>
> The Company expects to report a net loss of approximately $8.5 million for the quarter ended March 31, 2015 compared to a net loss of approximately $8.2 million for the quarter ended March 31, 2014. This increase in our net loss will be due primarily to a large decrease in our revenues due to the loss of our largest customer in the fourth quarter of 2014 coupled with increased legal and accounting fees incurred in regards to the aforementioned investigation offset, in part, by a decrease in share-based compensation. The Company also expects to report a cash and cash equivalents balance of approximately $17.5 million as of March 31, 2015.

(May 18, 2015 Form NT 10-Q.)

214. This corrective disclosure partially revealed the truth about Liquid's questionable status as a going concern moving forward and the Audit Committee's investigation into the Company. The details the Company offered about the Investigation partially revealed to investors that Liquid was a sham and that the Company had been misleading investors from the beginning. Further, this disclosure revealed that QuantX was integral in making Liquid look like a legitimate business

with more customers and revenue than it actually had. Thus, this disclosure partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

215. On this news, shares of Liquid declined from $0.21 per share at close on May 18, 2015, to $0.18 at close on May 19, 2015, a 14.2% drop, on unusually heavy volume.

*May 22, 2015 – Press Release*

216. On May 22, 2015, after the markets closed, Liquid issued a press release announcing that it had received a notification letter from staff of the NASDAQ Listing Qualifications Department (the "Staff"), dated May 19, 2015, stating that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), which requires timely filing of periodic reports with the SEC. The press release also reiterated the Company's May 18, 2015 filing, stating it was unable to file its Form 10-Q within the prescribed time period because of the on-going investigation and that the Company was working diligently to complete the investigation.

217. This corrective disclosure partially revealed the truth about Liquid's questionable status as a going concern moving forward. Additionally, this disclosure partially revealed to investors that Liquid was a sham and that the Company had been misleading investors from the beginning. Thus, this disclosure partially

revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

218. On this news, shares of Liquid declined from $0.20 per share at close on May 22, 2015, to $0.18 per share at close on May 26, 2015 (the next day of trading), a 10% drop, on unusually heavy volume.

*May 28, 2015 – Press Release*

219. On May 28, 2015, after the markets closed, Liquid issued a press release announcing a business update. The press release stated in pertinent part:

> "We are very encouraged by our continued traction with increasingly larger and more complex funds," said CEO of Liquid Holdings, Peter Kent. "In the first quarter of 2015, we on-boarded four customers from our backlog and signed two new customers, which will contribute to revenue in future quarters. In the fourth quarter of last year, we signed our largest customer to date, a registered investment advisor with approximately $2.5 billion under management. Additionally, one of our largest clients, an asset manager with approximately $800 million under management, went live on the Liquid platform and contributed to GAAP revenue in the fourth quarter of 2014."
>
> * * *
>
> It is the Company's understanding that its prior client QuantX ceased operations as of December 31, 2014. As a result, Liquid suspended all services to QuantX and QuantX-related managers as of January 8, 2015. Adjusting for the impact of QuantX's cessation of operations, Liquid had five customers contributing to GAAP revenue as of September 30, 2014. This compares to two customers as of both June 30, 2014 and March 30, 2014.
>
> (1) *Number of Units* - Since our customers generally pay fees based on the number of units of our platform being used within their organizations, we believe the total number of units is an indicator of the

> growth of the business. Each unit represents an individual element of the Liquid platform such as LiquidTrade℠, LiquidMetrics® or LiquidView®.

(May 28, 2015 Press Release.)

220. This partial disclosure revealed the truth about Liquid's customers as of June 30, 2014 and September 30, 2014. This disclosure revealed that Ferdinand and QuantX were integral in making Liquid look like a legitimate business with more customers and revenue than it actually had. Thus, this disclosure partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

221. On this news, shares of Liquid declined from $0.20 per share at open on May 29, 2015, to $0.19 per share at close on May 29, 2015, a 5% drop, on unusually heavy volume.

*August 17, 2015 – Form NT 10-Q*

222. On August 17, 2015, Liquid filed a notification of late filing on Form NT 10-Q ("August 17, 2015 Form NT 10-Q") with the SEC. The Form was signed by Kent on behalf of the Company. The Company stated in pertinent part:

> As previously reported, the Audit Committee of the Company's Board of Directors, with the assistance of outside legal counsel, is conducting an investigation into certain issues raised by counsel to one of our shareholders, including allegations about the Company's former senior management. Because of the timing of this investigation, the Company remains unable to deliver certain material to its independent registered public accounting firm for them to complete their audit of the Company's 2014 consolidated financial statements. Due to the impact

> of the above matters on the presentation of the Company's financial statements in its Quarterly Report, the Company is unable to file the Quarterly Report until the audit of the Company's 2014 consolidated financial statements is completed. The Company intends to file the Quarterly Report as soon as practicable, but at this time, the Company is unable to represent that Quarterly Report will be filed on or before the fifth calendar day following its prescribed due date.
>
> * * *
>
> The Company expects to report a net loss of approximately $8.3 million for the quarter ended June 30, 2015 compared to a net loss of approximately $6.3 million for the quarter ended June 30, 2014. This increase in our net loss will be due primarily to a large decrease in our revenues due to the loss of our largest customer in the fourth quarter of 2014 coupled with increased legal and accounting fees incurred in regards to the aforementioned investigation. The Company also expects to report a cash and cash equivalents balance of approximately $12.1 million as of June 30, 2015.

(August 17, 2015 Form NT 10-Q.)

223. This corrective disclosure partially revealed the truth about Liquid's questionable status as a going concern moving forward and the Investigation into the Company. The disclosure about the Investigation partially revealed to investors that Liquid was a sham and that the Company had been misleading investors from the beginning. Further, this disclosure revealed that QuantX was integral in making Liquid look like a legitimate business with more customers and revenue than it actually had. Thus, this disclosure partially revealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

224. On this news, shares of Liquid declined from $0.13 per share at open on August 17, 2015, to $0.11 per share at close on August 17, 2015, a 15% drop, on unusually heavy volume.

*<u>September 16, 2015 – Form 8-K</u>*

225. On September 16, 2015, the Company filed a current report with the SEC on Form 8-K ("September 16, 2015 Form 8-K") disclosing that the internal investigation had uncovered the use of improper accounting practices involving the Company's recognition of revenue, and that the Company would be restating its quarterly report for the period ended September 30, 2014. The Company stated in pertinent part:

> As previously reported, the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of Liquid Holdings Group, Inc. (the "Company"), with the assistance of outside legal counsel, has conducted an investigation (the "Investigation") into certain issues raised by counsel to one of the Company's stockholders, including allegations about the Company's former senior management. Based on the Investigation's findings and upon the recommendation of the Company's executive officers, on September 10, 2015, the Audit Committee and the Board concluded that the Company's previously issued unaudited condensed consolidated financial statements as of September 30, 2014 and for the three and nine months ended September 30, 2014 (the "Restatement Periods") should no longer be relied upon and should be restated (the "Restatement") due to certain accounting errors. The accounting errors involve the premature recognition of revenue from QuantX Management, LLP (together with its affiliates, "QuantX") and from other customers of the Company that had received allocations of capital from QuantX ("QuantX-related Customers") during the quarter ended September 30, 2014, before collectability was reasonably assured, given the significance of the uncertainty of

> collections from QuantX and QuantX-related Customers that became known to certain members of management during June 2014.
>
> Accordingly, investors should no longer rely upon the Company's previously filed financial statements and other financial data for the Restatement Periods or any press releases or other communications that relate to that information. The Company intends to present the restated financial statements and other financial data reflecting the Restatement in an amended and restated Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 (the "Amended Form 10-Q").

(September 16, 2015 Form 8-K.)

226. The Company also released its preliminary adjustments to its unaudited financial statements including software service revenue of $231,742 for the three months ending September 30, 2014, as opposed to the $1,485,007 previously reported. Additionally, the Company announced an additional net loss of $1,250,614 and an additional loss per share of (0.03).

227. This partial corrective disclosure revealed the truth that Liquid had known about QuantX's inability to pay Liquid during June 2014. Additionally, the partial corrective disclosure revealed that the Company prematurely recognized revenue from QuantX and revealed the true financials for the Company for the period ended September 30, 2014. The disclosure about the Investigation partially revealed to investors that Liquid was a sham and that the Company had been misleading investors from the beginning. Further, this disclosure revealed that QuantX was integral in making Liquid look like a legitimate business with more customers and revenue than it actually had. Thus, this disclosure partially revealed the fact that

Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment.

*September 24, 2015 – Form 8-K*

228. On September 24, 2015, the Company filed a current report with the SEC on Form 8-K ("September 24, 2015 Form 8-K") disclosing that the internal investigation had uncovered the use of improper accounting practices involving the Company's recognition of revenue, and that the Company would be restating its quarterly report for the period ended September 30, 2014. The Company stated in pertinent part:

> We previously disclosed that accounts receivable from QuantX were approximately $1,100,000 as of September 30, 2014 (a figure that was revised to zero in connection with the Restatement described below) and represented the balance due from QuantX for the sale of our software services. QuantX, a related party as a result of certain past or present relationships with Mr. Ferdinand, Mr. Keller and Richard Schaeffer (the founders of our Company) and/or Mr. Von Allmen (a holder of more than 10% of our common stock), was our largest customer. On December 23, 2014, we notified QuantX that it was delinquent in payments owed to us in the aggregate amount of approximately $1,400,000 pursuant to two technology services agreements and approximately $325,000 in additional delinquent payments, and demanded that QuantX pay such amounts owing to us immediately. We also suspended QuantX's access to our services.
>
> Prior to the quarter ended September 30, 2014, QuantX historically settled its accounts with us in full. However, it appears that during June 2014, certain members of management became aware that QuantX may have been experiencing significant liquidity issues, which created uncertainty thereafter as to QuantX's ability to meet its financial obligations despite the fact that as of June 30, 2014 QuantX was not in arrears for any previously purchased software services. In particular, it

appears QuantX would not have been able to pay in full our outstanding bills in the aggregate amount of approximately $1,200,000 as of June 30, 2014 had it not obtained additional funding from Mr. Von Allmen or D&L Partners. Because QuantX represented a substantial percentage of our revenues, its financial condition, liquidity and results of operations were closely tied to, and significantly impacted, our performance. QuantX liquidity issues could have a material adverse effect on our expected revenues, in the near term and possibly in the long term, and could result in a significant reduction in our revenues.

Based on the Investigation's findings and upon the recommendation of our executive officers, on September 10, 2015, the Audit Committee and the Board concluded that our previously issued unaudited condensed consolidated financial statements as of September 30, 2014 and for the three and nine months ended September 30, 2014 (the "Restatement Periods") should no longer be relied upon and should be restated (the "Restatement") due to certain accounting errors. The accounting errors involve the premature recognition of revenue from QuantX and from our other customers that had received allocations of capital from QuantX ("QuantX-related Customers") during the quarter ended September 30, 2014, before collectability was reasonably assured, given the significance of the uncertainty of collections from QuantX and QuantX-related Customers that became known to certain members of management during June 2014. On September 16, 2015, we filed a Current Report on Form 8-K with the SEC (i) stating that investors should no longer rely upon our previously filed financial statements and other financial data for the Restatement Periods or any press releases or other communications that relate to that information and (ii) setting forth estimated adjustments that we preliminarily anticipate to make to our unaudited financial statements for the Restatement Periods as a result of the Restatement.

* * *

**Audit Committee Investigation**

As previously reported, the Audit Committee, with the assistance of outside legal counsel, conducted the Investigation into certain issues raised by counsel to one of our stockholders, including allegations about our former senior management (see "Risk Factors" and

"Cautionary Statement Concerning Forward Looking Statements" below). The Audit Committee completed the Investigation, and some of the observations reported to our Audit Committee and Board in connection with the Investigation are as follows:

***Stock Transfer Agreement with Douglas J. Von Allmen***

We previously disclosed that Brian Ferdinand, one of our founders and our former Vice Chairman and Head of Corporate Strategy, and Douglas J. Von Allmen, a beneficial owner of more than 10% of our common stock, purchased an aggregate of $16.2 million of shares of our common stock in our initial public offering (the "IPO") at the IPO price per share of $9.00. We also previously disclosed that, in late February of 2014, entities controlled by two of our founders, Mr. Ferdinand and Robert Keller, transferred 732,292 shares of our common stock to D&L Partners, LP ("D&L Partners"), an entity controlled by Mr. Von Allmen, and certain other pre-IPO stockholders without the payment of any cash consideration. Based on the results of the Investigation, it appears that these shares were transferred to such entity pursuant to an agreement among Messrs. Ferdinand, Keller and Von Allmen, which was entered into prior to our IPO, to transfer additional shares of our common stock to Mr. Von Allmen at no cost after the expiration of the lock-up agreements signed in connection with the IPO. We are not in possession of that agreement.

***Brian Storms' Loan from CMK Keller Holdings, LLC***

We previously disclosed that, on May 14, 2013, CMK Keller Holdings, LLC ("CMK LLC"), of which one of our founders and a former director, Mr. Keller, is the managing member, sold Mr. Storms, a former member of the Board and our former Chief Executive Officer and Vice Chairman, 766,466 shares of our common stock for $5,000,000. We estimated the fair value of the shares sold at $5,780,000. As a result of this sale below fair value, we recorded a share-based compensation expense of $780,000 in the second quarter of 2013. Based on the results of the Investigation, it appears that: (i) on May 14, 2013, Mr. Storms issued a Demand Promissory Note (the "Note") in the principal amount of $5,000,000 to CMK LLC, as consideration for the sale of these shares; and (ii) on December 2, 2014, Mr. Storms and CMK LLC entered into an Addendum to the Note and

reduced the principal amount of the Note from $5,000,000 to $1,250,000, a transaction that requires us to take an additional compensation expense in the fourth quarter of 2014.

***Brian Storms' Loans from Brian Ferdinand, Douglas J. Von Allmen and The Bridgehampton National Bank***

Based on the results of the Investigation, it appears that:

(i) in March 2014, Mr. Ferdinand loaned approximately $1,100,000 to Mr. Storms in connection with Mr. Storms' tax obligations related to Restricted Stock Units granted by Liquid on December 1, 2012;

(ii) in October 2014, Mr. Storms received a loan from D&L Partners in the amount of $1,100,000 that Mr. Storms used to repay the March 2014 loan to Mr. Ferdinand; and

(iii) in December 2014, The Bridgehampton National Bank (the "Bank") loaned $2,000,000 to Mr. Storms, of which $1.1 million was used to repay the October 2014 loan from D&L Partners, LP. Mr. Storms repaid his loan to the Bank in January 2015. Dennis Suskind, Chairman of the Audit Committee, is also Vice Chairman of Bridge Bancorp, Inc., the registered bank holding company for the Bank.

In addition, based on the results of the Investigation, it appears that D&L Partners loaned $130,000 to Mr. Storms in May 2014 to buy shares of our common stock in the open market.

(September 24, 2015 Form 8-K, at 5-7.)

229. This corrective disclosure revealed the truth about the related-party transactions and that the Company had known since June 2014 that QuantX was unable to pay Liquid. This disclosure also revealed to investors that Liquid was a sham and that the Company had been misleading them from the beginning. This disclosure also revealed the pre-IPO agreement between Messrs. Ferdinand, Keller

and Von Allmen, demonstrating that the insiders only valued the IPO price at $6.31. Similarly, the "loans" to Storms also revealed that the insiders did not believe the stock was worth $9.00 per share. Had Storms, Keller, or any of the Section 10(b) Defendants truly believed that the Company's stock was worth $9.00 per share, then Storms would not have been able to simply receive $5,000,000 of Liquid stock for no consideration. Finally, this disclosure revealed that Storms had been given money from multiple insiders that he either attempted to mischaracterize or hide from investors. This disclosure revealed that Liquid was a sham and that the Section 10(b) Defendants had been lying to investors from the beginning. Defendants had misled investors and used Liquid as a vehicle for Defendants' self-dealing and personal enrichment.

230. In response to this news, on September 24, 2015, Liquid stock decreased from $0.09 per share of common stock at open to $0.08 per share by close, an 11% drop on unusually heavy trading volume.

**C. Subsequent Class Period Statements – The Chapter 11 Bankruptcy**

231. Liquid filed for Chapter 11 Bankruptcy on January 27, 2016 (the "Bankruptcy") in the United States Bankruptcy Court for the District of Delaware (Case No. 16-10202-KG). In connection with the Bankruptcy, Kent filed a declaration in support of the Chapter 11 petitions and various first day applications and motions.

232. Kent stated in pertinent part that Liquid relied significantly on the revenues generated by a single customer, QuantX, and that QuantX was a related party as a result of certain past or present relationships with Ferdinand, Keller, Schaeffer, and Von Allmen.

233. Kent expanded on the situation with QuantX stating that on December 23, 2014, Liquid notified QuantX that it was delinquent in payments owed to the Company in the aggregate amount of approximately $1,400,000 pursuant to two technology services agreements and approximately $325,000 in additional delinquent payments and demanded that QuantX pay such amounts immediately.

234. Shortly thereafter, QuantX and all of the customers that had been generated as a result of Liquid's relationship with QuantX ceased being Liquid's customers. QuantX ceased its operations on or about December 31, 2014. Without QuantX, Kent revealed that as of January 14, 2016, Liquid had approximately 10 customers, which customers are located in the United States and Europe.

**D. Defendants Acted with Scienter**

235. For the purposes of Plaintiffs' claims under the Exchange Act only, Plaintiffs allege that the above material misrepresentations and omissions were made by the Section 10(b) Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a) personal financial gain; (b) inflating market demand for Liquid shares in the IPO and the secondary offering; (c) securing

additional financing to continue as a going concern; and (d) raising capital to fund additional research and development efforts and modifying Liquid's product.

236. The Section 10(b) Defendants were aware of the falsely reported related-party transactions and of QuantX's inability to meet its financial obligations to the Company. The Section 10(b) Defendants provided investors with material information concerning the Company's revenue from QuantX while at the same time knowing that QuantX was unable to pay.

*Parties to the Agreements*

237. Here, indicative of scienter is the fact that Storms and Ferdinand were parties to related-party transactions about which the fraudulent statements were made. For example, Ferdinand was a party to the pre-IPO stock transfer agreement among Ferdinand, Keller, and Von Allmen. Nevertheless, Ferdinand signed Liquid's 2013 Registration Statement knowing that he was a party to a material related-party transaction that was not disclosed.

238. Similarly, Storms was a party to the loan he received from CMK on May 14, 2013. Despite his participation in the agreement, Storms knowingly signed off on the misleading Registration Statement that identified the transaction as a stock sale rather than a loan.

239. Storms and Ferdinand were also parties to the loan agreements in March 2014 just as Storms and Von Allmen (through D&L Partners) were participants to

the transactions and/or loans in May and October 2014. As such, Storms and Ferdinand knew about the subsequent false misrepresentations in the filings.

240. These mischaracterizations and concealments of loans to Storms is highly suspicious and indicative of scienter. Storms, as CEO, had control over the Company's public statements. The fact that Storms concealed the above transactions in which he was directly involved is highly suspicious and indicative of scienter.

241. Ferdinand also acted with scienter. As an owner of QuantX, Ferdinand knew, or was reckless in not knowing, when he resigned from Liquid in April 2014 that QuantX would not be able to pay Liquid. The Audit Committee Report states that QuantX would not have been able to pay Liquid in the second quarter of 2014 had QuantX not received additional financing from Von Allmen. This is exactly when Ferdinand resigned. QuantX is partially owned by Ferdinand, Schaeffer, and Keller and was the Company's main source of revenue. QuantX was in dire need of financing due to its liquidity problem and as partial owner, Ferdinand knew of QuantX's inability to pay.

242. Further indicative that Ferdinand and Defendants used Liquid as a vehicle for Defendants' self-dealing and personal enrichment is the fact that Ferdinand remained a consultant to the Company. Despite being both a consultant to Liquid and part-owner of QuantX, Ferdinand continued to conceal from investors

the state of QuantX. Ferdinand continued to write off his expenses as a consultant and used Liquid for his personal enrichment.

243. CW1 also confirms that QuantX was repeatedly, month after month, late in paying its invoices to Liquid. CW1 also stated that Ferdinand made excuses and assurances regarding late payments to Kent, the CFO who replaced Shifrin. Ferdinand's excuses on behalf of QuantX are highly indicative that Ferdinand knew exactly what was going on at QuantX but that management (*i.e.*, Ferdinand in particular) covered it up to continue profiting from the fraud.

244. Based on these facts, the Section 10(b) Defendants either knew or recklessly disregarded the misleading nature of the statements made to investors.

*The Audit Report's Investigation*

245. The Audit Committee of the Company's Board, with the assistance of outside legal counsel, conducted an investigation into certain issues raised by counsel to one of the Company's stockholders, including allegations about the Company's former senior management. The Company released the Audit Committee's findings on September 24, 2015. The Company's Audit Committee found that wrongdoing had occurred.

246. Specifically, as a result of the Audit Committee's Investigation, the Audit Committee found that the Company was responsible for several

misrepresentations and omissions due to a material weakness in the Company's internal controls that existed throughout the Class Period.

247. First, the Audit Committee stated that the Company failed to disclose to investors an agreement among Ferdinand, Keller, and Von Allmen, which was entered into prior to the Company's IPO, to transfer additional shares of Liquid's common stock to Von Allmen at no cost after the expiration of the lock-up agreements signed in connection with the IPO.

248. Additionally, the Investigation revealed that Liquid misrepresented a related party transaction between Storms and CMK. The Registration Statement classified the transfer of 766,466 shares of Liquid common stock from CMK to Storms as a stock sale for $5,000,000. However, as the Audit Committee stated, this transaction was actually a loan from CMK to Storms.

249. The Investigation also revealed four other non-disclosed loans taken by Storms from related parties throughout the Class Period. These include (i) in March 2014, Ferdinand loaned approximately $1,100,000 to Storms in connection with Storms' tax obligations related to Restricted Stock Units granted by Liquid on December 1, 2012; (ii) in October 2014, Storms received a loan from D&L Partners in the amount of $1,100,000 that Storms used to repay the March 2014 loan to Ferdinand; and (iii) in December 2014, The Bridgehampton National Bank loaned $2,000,000 to Storms, of which $1.1 million was used to repay the October 2014

loan from D&L Partners. Suskind, Chairman of the Audit Committee, is also Vice Chairman of Bridge Bancorp, Inc., the registered bank holding company for the Bridgehampton National Bank. In addition, based on the results of the Audit Committee's investigation, it appears that D&L Partners loaned $130,000 to Storms in May 2014 to buy shares of the Company's common stock in the open market.

250. In addition to the related-party transaction misrepresentations, the Audit Committee also found that during June 2014, certain members of management became aware that QuantX was experiencing significant liquidity issues, which created uncertainty thereafter as to QuantX's ability to meet its financial obligations despite the fact that as of June 30, 2014, QuantX was not in arrears for any previously purchased software services.

251. Adding to Plaintiffs' scienter allegations is the fact that despite the Company's admitted knowledge, Storms, and Shifrin, until his "resignation," continued to sign SOX certifications when they knew that the controls they attested to were inadequate.

252. Furthermore, the Audit Committee specifically stated in the September 24, 2015 Form 8-K that certain parties that are likely to have information relevant to its investigation declined to participate in the investigation process. Had the parties not been acting with scienter, they would have fully cooperated. Thus, the fact that

Liquid insiders refused to cooperate with the Audit Committee's investigation is highly indicative of scienter.

253. Given the Audit Committee's findings that the Company and management knew about QuantX's inability to pay as early as June 2014, but failed to inform investors and continued to recognize QuantX revenue before it was received, the Section 10(b) Defendants acted with scienter.

*Insider Stock Sales*

254. Further evidence that the Section 10(b) Defendants knew of the fraud was their atypical stock sales. Ferdinand's stock sales were highly indicative of a strong, cogent, and compelling inference of scienter. For example, on November 7, 2014, while management knew that QuantX was unable to pay, Ferdinand Holdings, LLC sold 375,000 shares for approximately $296,250, an average price of $0.79. Had Ferdinand waited until after the Company announced that it terminated its relationship with QuantX, Ferdinand would have only received $150,000, an average price of $0.40, almost 50% less than what he received. This is indicative of scienter because of its relative proximity to the December 23, 2014 corrective disclosure and the large volume of shares sold. Up to this point, Ferdinand had not sold a single share on the public market. The atypicality of Ferdinand's stock sale strongly suggests that the sale was executed in order to profit financially from adverse non-public information, which supports a strong inference of scienter.

255. Additionally, prior to June 2014, Defendants Storms and Ferdinand all purchased shares of Liquid on the open market with the intention that the fraud would continue to artificially inflate the stock price. The following chart indicates the pattern and scienter displayed by Storms and Ferdinand through their stock purchase and sales between March 2014 and April 2015. The chart also shows the trading history of several other Liquid insiders:

| Date | Insider | Transaction Type | Relation | Shares | Price |
|---|---|---|---|---|---|
| 3/23/2015 | Ibietatorremendia Jose | Surrender | Officer | 6,725 | $0.31 |
| 3/23/2015 | O'Boyle Robert | Surrender | Pres | 6,494 | $0.31 |
| 3/16/2015 | Storms Brian M | Surrender | Officer/Dir | 94,414 | $0.29 |
| 12/24/2014 | Bernstein Jay Howard | 144 Sale | Affil Person | 238,207 | $0.39 |
| 12/24/2014 | Hunter Creek LLC | 144 Sale | Affil Person | 148,667 | $0.39 |
| 12/19/2014 | Bernstein Jay Howard | 144 Sale | Affil Person | 32,400 | $0.82 |
| 12/18/2014 | Hunter Creek LLC | 144 Sale | Affil Person | 25,000 | $0.83 |
| 11/7/2014 | Ferdinand Holdings LLC | 144 Sale | >10% Own | 375,000 | $0.79 |
| 9/18/2014 | Shifrin Kenneth David | 144 Sale -Planned[P] | CFO | 13,480 | $1.48 |
| 9/18/2014 | Shifrin Kenneth David | Sale -Planned[P] | CFO | 13,480 | $1.43 |
| 8/20/2014 | Shifrin Kenneth David | 144 Sale -Planned[P] | CFO | 20,260 | $1.35 |
| 8/20/2014 | Shifrin Kenneth David | Sale -Planned[P] | CFO | 20,260 | $1.35 |
| 5/20/2014 | Simone Victor R Jr | Purchase | Dir | 25,000 | $1.58 |
| 5/15/2014 | Bernstein Jay Howard | Purchase | Dir | 1,925,300 | $1.25 |
| 5/16/2014 | Storms Brian M | Purchase | CEO | 100,000 | $1.26 |
| 5/15/2014 | Francescani David | Purchase | Dir | 600,000 | $1.25 |
| 5/15/2014 | Ibietatorremendia Jose | Purchase | Officer | 20,000 | $1.26 |
| 5/15/2014 | von Allmen Douglas J | Purchase | >10% Own | 6,400,000 | $1.25 |
| 2/27/2014 | von Allmen Douglas J | Purchase | >10% Own | 145,687 | $4.76 |
| 3/3/2014 | Ferdinand Brian | Purchase | Ofcr/Dir/>10% | 153,413 | $5.18 |

**P - Traded per pre-arranged plan (10b5-1)**

256. As indicated in the chart above, Liquid insiders routinely purchased stock up until June 2014. After the Company found out in June 2014 that QuantX

was unable to pay, not a single Section 10(b) Defendant purchased any shares. These atypical stock sales and behavior are indicative of scienter because the Section 10(b) Defendants continued purchasing shares in the Company with the hopes that their fraud would raise the stock price and they could subsequently sell their shares into the open market and reap a profit. However, once the insiders found out that QuantX was unable to pay Liquid in June 2014, the Section 10(b) Defendants abandoned their scheme.

257. By committing the fraud they did, the Section 10(b) Defendants were able to ensure the consummation of the IPO. In so doing, they were able to materially increase the value of the Liquid stock that they owned prior to the IPO by virtue of introducing it to the retail public through the NASDAQ exchange. The increased liquidity that public trading brought to Liquid's shares resulted in significant profit to the Section 10(b) Defendants. Indeed, at an IPO price of $9.00 per share, the Section 10(b) Defendants (together with Von Allmen and Keller) collectively held over $162 million of Liquid stock that was previously worth far less due to the fact that it was not publicly traded on the NASDAQ exchange.

*Departure of Key Employees*

258. The departure of several key employees is also indicative of scienter.

259. The Company announced that as of March 1, 2015, Brian Storms transitioned from the role of Chief Executive Officer to Vice Chairman of Liquid,

and that Storms "resigned" on September 8, 2016. Storms' supposed "resignation" was in fact a termination of employment. The truth about Storms' departure from the Company is evident from the fact that his "resignation" occurred just before the Company's announcements about Liquid's insolvency.

260. Similarly, on April 18, 2014, the Company announced that Ferdinand "resigned" from his position on the Board. However, this was just over one month before June 2014, the date management knew that QuantX was unable to pay Liquid. As part owner of QuantX, Ferdinand knew about QuantX's inability to pay prior to the rest of the Company, thus supporting the inference that Ferdinand was fired for his role in the fraudulent conduct complained of herein.

261. Additionally, on December 23, 2014, the Company also announced the termination of the Amended and Restated Consulting Agreement (the "Consulting Agreement"), dated October 16, 2014, between the Company and Ferdinand Trading. Pursuant to the Consulting Agreement, Ferdinand Trading was obligated to make Ferdinand available to the Company to provide services requested of him by the Company, including assisting with business development efforts; developing strategy for product development, marketing, partnerships, and mergers and acquisitions; and providing support to the sales and marketing team, including client introduction. The Company stated the reason for the termination was the result of the breach by Ferdinand Trading and Ferdinand of certain of their obligations under

the Consulting Agreement and related agreements. The fact that Ferdinand refused to perform under the Consulting Agreement and the Company subsequently terminated the Consulting Agreement corroborates the conclusion that Ferdinand was responsible for the wrongdoing alleged and, as a result, is indicative of scienter.

262. Shifrin also “resigned” on October 24, 2014, just six days before the release of the Q3 2014 Press Release, Q3 2014 Earnings Conference Call, and Q3 2014 Form 10-Q. As indicated by CW1, Shifrin did not resign but was fired due to the Company’s lack of internal controls over thefts within the Company. Therefore, this is also highly indicative of scienter.

263. These “resignations” of the Company’s former top officials are highly suggestive of scienter because of their proximity to fraudulent wrongdoing and/or the public disclosure of the fraudulent wrongdoing. The closeness in time to the events that occurred suggest that these individuals were in fact terminated for cause in connection with the fraud itself and not, as the Company claimed, the result of amicable resignations.

264. A statement made by Kent himself further confirms the fact that these individuals were terminated for cause. On January 12, 2016, while attempting to effect service on Storms, Shifrin, and Ferdinand at Liquid’s former New York City office, Kent told a process server employed by Plaintiffs’ counsel that these three individuals were fired in connection with the wrongdoing that had occurred at the

Company. Specifically, while serving Kent with a summons and complaint on January 12, 2016, Plaintiffs' process server asked Kent whether he was authorized to accept service on behalf of Storms, Shifrin, and Ferdinand. Kent declined, stating that Storms, Shifrin, and Ferdinand were fired due to this matter. Kent further stated that Ferdinand was the "culprit." Kent's remarks are corroborated by the fact that Liquid's bankruptcy schedules indicate that Liquid itself holds potential claims sounding in breach of contract, breach of duty, self-dealing, and conversion against Ferdinand and Schaeffer. *In re Liquid Holdings Group, et al.*, No. 16-10202 (KG) (Doc. No. 36, at 23). Kent signed Liquid's schedules under penalty of perjury on February 16, 2016.

265. The resignation of Grant Thornton LLP ("Grant Thornton") as the Company's independent registered public accounting firm as of September 18, 2015 also supports an inference of scienter. Grant Thornton had worked with Liquid since September 2014. On September 18, 2015, Grant Thornton notified Liquid that it was resigning as the Company's independent registered public accounting firm effective immediately. On September 21, 2015, the Company received a letter from Grant Thornton stating that it had terminated its services to the Company and resigned from its engagement to audit the Company's consolidated financial statements for the fiscal year ended December 31, 2014 and to perform related interim reviews due to "a number of unexpected circumstances that [had] arisen since" the date of their

engagement letter, as amended. According to CW1, Grant Thornton objected to Liquid's use of Liquid's long-used outside counsel to conduct an internal investigation of certain related-party and/or self-interested transactions and demanded a neutral law firm preside.

266. Grant Thornton's unexpected and abrupt resignation at or around the time the Audit Committee announced its final conclusions of the investigation strongly suggests that Grant Thornton resigned as a result of the Audit Committee's investigations and, specifically, Liquid's insistence that it use its conflicted longtime outside counsel to oversee the investigation. Grant Thornton's resignation as Liquid's auditor further supports a strong inference of scienter.

*Change in Risk Warnings*

267. Further evidence that the Company knew about the fraud was the risk warning added to the Company's November 14, 2014 quarterly report. Prior to November 14, 2014, Liquid simply referred investors to their 2013 Form 10-K. The Form 10-K risk warnings stated in pertinent part:

> We currently have a limited number of customers, most of which to date have been generated as a result of pre-existing relationships of these customers with our founders and entities affiliated with them. We may not be successful in attracting new customers. In addition, the loss of or events affecting one or more of our customers could materially and adversely affect us and cause our stock price to decline significantly.

(2013 Form 10-K, at 20.)

268. However, on November 14, 2014, for the period ended September 30, 2014, the Company added additional risk warnings related to QuantX's operations. The Company stated in pertinent part:

> While QuantX represents a substantial percentage of our revenues and outstanding accounts receivable, they have historically settled their accounts with the Company in full. However, QuantX's business results are highly tied to the performance of their investment managers and the amount of capital under management. This can cause QuantX's revenues and cash flows, at times, to be quite variable. As a result, their payments to the Company can also be quite variable in amounts and timing. As QuantX's results are highly tied to their performance in the marketplace, there can be no assurance that future payments to the Company will be made on a timely basis or in full.

(Q3 2014 Form 10-Q at 12.)

269. This new risk warning indicates that the Section 10(b) Defendants knew that QuantX was unable to pay Liquid monies owed under its contract. In an effort to protect themselves against accusations of wrongdoing, the Section 10(b) Defendants inserted additional risk warnings to soften the ultimate revelation (that they knew they would eventually have to make to investors) that QuantX would not be able to pay Liquid. The Section 10(b) Defendants' insertion of this new language not only shows that they knew the truth (yet actively withheld it from investors regardless), but also that they were attempting to conceal the wrongdoing that had occurred. This is highly indicative of scienter.

*Core Operations*

270. The Section 10(b) Defendants either knew or recklessly disregarded QuantX's inability to pay Liquid because QuantX represented the majority of Liquid's revenue.

271. For the years ended December 31, 2012 and December 31, 2013, 56% and 39%, respectively, of Liquid's revenues were attributable to commissions and fees from broker-dealer operations, while 44% and 61%, respectively, came from subscription fees, primarily from QuantX.

272. The over-the-counter brokerage operations were discontinued June 1, 2013, leaving software as the only source of revenue. Liquid sold its software in two ways, direct customer sales and volume-based institutional licensing. Direct customer sales revenue was generated through software licensing fees. Institutional licensing revenue was generated through software licensing and subscription fees, integration and customization fees, and hosting and gateway fees. Prior to December 31, 2012, Liquid's software revenues also included messaging fees. Total software revenue in 2013 was $2,925,650, of which $2,387,825 was from QuantX.

273. For fiscal 2013, QuantX was responsible for 44% of the Company's total revenues and, within the software services segment, 72% of revenues.

274. QuantX was critically important to Liquid. During the October 2014 Earnings Call, Storms reiterated the importance of QuantX to Liquid's operations,

stating in pertinent part: "... as we think about that relationship going forward and God knows we think about it every day . . . [w]e are going to have to really reflect the variances in how that business affects our business . . . ."

275. Given QuantX's importance to Liquid's operations, Liquid and the Section 10(b) Defendants either knew or recklessly disregarded QuantX's financial difficulty and/or that it would be unable to pay as of June 2014. Indeed, when the Company finally revealed the truth about QuantX, it did so while simultaneously writing down its software services revenue from $1,485,007 to $231,742, a 640% decrease. The materially large reduction to revenue, and threat it posed to Liquid's ability to remain a going concern, provided the Section 10(b) Defendants with a motive to conceal the truth. The fact that Liquid did not disclose this information timely gives rise to a strong inference of scienter.

*The Section 10(b) Defendants Benefitted Financially from the Fraud*

276. The Section 10(b) Defendants' motivation behind the misrepresentations and omissions in the Registration Statement and throughout the Class Period stems from their desire to profit financially, their dire need for financing via the IPO, the promise of bonuses and representations the Company made to pre-IPO investors, and the risk that the Company would be unable to pay the Section 10(b) Defendants their annual employee and director compensation.

277. The Company was in no position to go public but did so in order to raise capital for the purposes of paying bonuses and to satisfy representations the Company made to pre-IPO investors. This was confirmed by CW6 who stated he only invested pre-IPO because of the promise he received that the Company would go public in 2012. Additionally, not even Liquid's own customers thought that Liquid should go public. CW1 and CW3 stated that the Company should have never have gone public, and that "the product wasn't quite ready." CW5 stated that employees were concerned about the number of customers that Liquid actually had. Additionally, CW4 stated that the Company only went public to lure large hedge funds that it could not otherwise retain.

278. CW1, 3, 4, 5, and 6's accounts are corroborated by allegations from a lawsuit filed in the Supreme Court of the State of New York styled *Ryan v. Liquid Holdings Group, LLC*, Index No. 156735/2013. Therein, the plaintiffs alleged that the Registration Statement falsely stated that Liquid had 24 users of its software. In reality, the 24 users referred to by Liquid in the Registration Statement referred to terminals used by the plaintiffs in their brokerage business. According to the plaintiffs in the lawsuit, Liquid's software did not work, as it was never able to be loaded on the various computers at the brokerage business. Notwithstanding, Liquid represented that these users were using Liquid's software and, in turn, that Liquid was generating revenue from the use of its software.

279. Notwithstanding these concerns, the Company went public because, according to CW3, Schaeffer knew "how to go public with little revenue and customers." Thus, despite the Company only having one main customer that comprised the majority of its software licensing revenues, the Section 10(b) Defendants took the Company public for their personal benefit.

280. Evidence that the Section 10(b) Defendants used the Company to personally benefit is apparent from the following table, which indicates that insiders received material amounts of money from the Company:

| **Payments from Liquid to Insiders not including Base Salary or Yearly Bonuses** | | | | |
|---|---|---|---|---|
| **Date** | **Transaction** | **Payor** | **Payee** | **Amount** |
| 2012 | Stock Award | Liquid | Storms | $5,731,873 |
| 2012-2013 | Stock Awards | Liquid | Ferdinand | $11,127,343 |
| 2013 | Stock Awards | Liquid | Shifrin | $722,500 |
| January, 2012 | Consulting Services | Liquid (LTI) | Ferdinand (LTM) | $250,000 |
| June, 2013 | Consulting Services | Liquid | Schaeffer | $150,000 |
| July, 2013 | Repayment of Loan | Liquid | Ferdinand | $251,000 |
| July, 2013 | Repayment of Loan | Liquid | Schaeffer | $251,000 |
| July, 2013 | Repayment of Loan | Liquid | Ross | $250,400 |
| July, 2013 | Repurchase of Shares | Liquid | Storms | $883,575 |
| July, 2013 | One-time Payment | Liquid | Ferdinand, Schaeffer, Keller | $1,021,000 |
| July, 2013 | IPO Bonus | Liquid | Schaeffer | $250,000 |
| July, 2013 | IPO Bonus | Liquid | Ferdinand | $250,000 |
| July, 2013 | IPO Bonus | Liquid | Keller | $40,000 |
| October, 2013 | Lease (5 year term) | Liquid | Storms | $1,394,820 |
| April, 2014 | Consulting Services | Liquid | Ferdinand | $450,000 |

| Loans between Liquid and Related Parties | | | | | |
|---|---|---|---|---|---|
| **Date** | **Transaction** | **Lender** | **Borrower** | **Interest Rate** | **Amount** |
| 2011 | Loan | Liquid (LTI) | Ferdinand Capital | 4% per annum | $116,000 |
| December, 2012 | Loan | Liquid | QuantX | 4% per annum | $243,030 |
| June, 2013 | Loan | Liquid | QuantX | 3% per annum | $5,000,000 |
| June, 2013 | Loan | Schaeffer | Liquid | 4% per annum | $250,000 |
| July, 2013 | Loan | Ferdinand | Liquid | 4% per annum | $250,000 |
| July, 2013 | Loan | Ross | Liquid | 4% per annum | $250,000 |
| December, 2013 | Loan | Liquid | Shareholder | 3% per annum | $300,000 |

281. As indicated by the chart above, in just two years, the majority of the Section 10(b) Defendants raided over $22 million from Liquid's corporate accounts, excluding base salary and yearly bonuses. Additionally, the Company loaned $5,659,030 to related parties, which in turn benefited a number of the Section 10(b) Defendants. These amounts are highly material when considering the Company had only $4,798,297 in total revenue in 2013, and $2,327,783 in total revenue in 2012. This is also material because the Company was pre-profit. While the Company had a net loss of ($46,720,119) in 2013, the Section 10(b) Defendants paid themselves millions of dollars to the detriment of the shareholders.

282. Furthermore, the loans made to Schaeffer, Ferdinand, and Ross were material and were made on unfavorable terms to the Company. For example, the loans had a term of six months and provided the lender a rate of 4% per annum. However, at the same time these loans were made, a comparable one-year cash deposit yielded an interest rate of only 0.24% and a six-month cash deposit yielded

just 0.15%.[2] The loans yielded the lenders 2% over their six-month term, over 1,300% above the going market rate.

283. The bonuses received by Schaefer and Ferdinand for consummating the IPO were also material and support an inference of scienter. Schaefer's and Ferdinand's base salary during 2013 was $250,000, which would increase to $500,000 upon the completion of the IPO. The Company had been operating for just over a year when it went public. Schaefer and Ferdinand guaranteed themselves an additional $250,000 per year and a $250,000 bonus just for prematurely taking the Company public. This totaled twice the amount of their base salaries not including the one-time payments they also received.

284. In addition to these immediate payments, Storms, Schaefer, and Ferdinand also were paid $5,731,873, $8,598,593, and $4,760,000 in Liquid stock compensation during 2012 alone. At the time of these awards, the Company was operating at a ($38,245,864) net loss for 2012. This amount was material and unreasonable for a Company that was pre-profit and had just over $2,000,000 in revenue during 2012. Thus, the Section 10(b) Defendants were motivated to consummate a public offering so as to be able to freely trade their shares in the open market in order to monetize the large amounts of stock they held personally as well

[2] Comparable cash deposit rates were obtained from BankRate.com, *available at* http://www.bankrate.com/finance/cd-rates-history-0112.aspx (last accessed December 17, 2016).

as ensure that Liquid had enough funds to continue paying their extreme salaries and bonuses.

285. Additional proof that Defendants used Liquid to the detriment of shareholders are the "Consulting Agreements" Liquid entered into with Ferdinand and Schaefer in addition to their already lucrative salaries. The Company stated that as of June 3, 2013, Schaeffer would provide relationship management and sales and marketing consulting services to the Company for a twelve-month term. The consulting agreement provided for $12,500 per month as compensation for his services. In addition to the fees provided under the June 3, 3013 consulting agreement, Schaeffer was also entitled to receive any fees for his service as a director of the Company. Similarly, the Company disclosed that LTI, a company that Liquid acquired, entered into an agreement with Liquid Trading Management LLC, or LTM, an entity controlled by Ferdinand, for consultation services. During the period ended September 30, 2012, the Company paid $250,000 to LTM. These amounts are highly material when considering Schaeffer's and Ferdinand's already lucrative salaries and duties to the Company and indicate that Schaeffer and Ferdinand acted with scienter.

286. The Company also entered into a lease agreement with an entity in which Storms served as a member of the board. Liquid was under lease to pay Storms' affiliated entity over $1,000,000. Additionally, Storms received "loans" that

he attempted to mischaracterize or conceal from investors as stated above. In addition to these financial benefits, according to CW2, Storms also expensed costs from his car dealership onto Liquid. This further illustrates the motives underlying the Section 10(b) Defendants' use of Liquid to enrich themselves to the detriment of Liquid's shareholders, and further demonstrates that Storms in particular acted with scienter.

287. The "Use of Proceeds" section in the Registration Statement further expands on the Section 10(b) Defendants' motives to take Liquid public. Out of the $26,717,625 received by the Company in the IPO before expenses, the Company only netted approximately $17,400,000. Total IPO expenses were $11,175,000, or 39% of the IPO proceeds, of which a material amount went to related parties to pay loans, bonuses, and one-time payments. The Company indicated that only approximately $14.76 million of the net proceeds from the IPO would be available for business purposes. The amount of expenses incurred in the IPO is highly material and indicative of scienter for a pre-profit Company that was in dire need of cash to continue as a going concern. Without further infusions of cash, the Company would not be able to continue to operate. However, instead of using the cash for operations, the Section 10(b) Defendants used the money to profit financially. Thus, these facts suggest that the Section 10(b) Defendants acted with scienter.

288. CW1 and CW2 also confirm that management routinely used Liquid as their personal bank. For instance, management used Liquid to pay cable bills, go to amusement parks, purchase watches, hire personal drivers, and even had an expense account to cover random executive expenses. As indicated by CW1 and CW2, the Company had no internal controls to determine what was proper or improper. As such, management was free to use shareholders' money invested in Liquid as its personal bank account. Thus, the Section 10(b) Defendants had a motive to misrepresent the true financials of the Company and the Company's related-party transactions. These cover-ups are highly indicative of scienter.

289. The Section 10(b) Defendants also had a motive to misrepresent the related-party transactions in the Registration Statement. For example, Ferdinand entered into an agreement pre-IPO to transfer an additional 732,292 shares of Liquid common stock to Von Allmen and other pre-IPO stockholders without the payment of any cash consideration once the lock-ups had expired. Had investors known that Liquid's own directors did not value the stock at the IPO price and had already entered into agreements to dispose of stock for no consideration, the price of the IPO would likely have been even further reduced. However, by waiting until February 2014, the Company was able to lure investors at a higher price and later dispose of their holdings once the lock-ups expired. These facts are highly suspicious and indicative of scienter.

290. Similarly, by misrepresenting the fact that Storms borrowed $5,000,000 to purchase shares of Liquid prior to the IPO, as opposed to using his own money, the Company was able to mislead investors about the demand and value for Liquid stock. For example, Storms drove up the demand by purchasing shares with borrowed money, knowing he would not be personally liable for the loan (as was later shown when the loan was partially written off). However, by indicating that he purchased the shares, he represented to investors that he believed in the stock so much that he was risking his own hard-earned money. As such, investors were led to believe that Storms was so confident in the Company that he purchased an additional $5,000,000 in Liquid common stock, a material amount. Thus, Storms had motive to falsify the related party transactions to drive up demand in the IPO.

*The SEC Is Investigating Liquid*

291. On or around March 19, 2015, Liquid received a "document preservation notice" from the SEC. According to Liquid's September 24, 2015 Form 8-K, the preservation notice required Liquid to "preserve documents in connection with an ongoing investigation being conducted by the [SEC]." Liquid, as of March 19, 2015, claimed it had not been "formally informed" of the matters under investigation and that it not received a subpoena from the SEC.

292. Although Liquid stated in its September 24, 2015 Form 8-K that it was "unable to assess with confidence or certainty how long the SEC investigatory

process will last or its ultimate outcome," as of February 16, 2016 (nearly a year after receipt of the initial preservation notice), Liquid was still under investigation. Liquid's schedules in support of its bankruptcy petition include a table listing all legal and administrative actions. Within the table, Liquid lists an "Investigation" by the SEC, styled *In the Matter of Liquid Holdings Group, Inc.*, as one of its "Pending" actions.

293. The fact that the SEC commenced an investigation into Liquid's operations and, importantly, that the SEC's investigation has continued up to and through the present date, is indicative of scienter on the part of the Section 10(b) Defendants.

## E. Loss Causation and Economic Loss

294. During the Class Period, as detailed herein, the Section 10(b) Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Liquid's securities and operated as a fraud or deceit on Class Period purchasers of Liquid's securities by materially misleading the investing public.

295. These false and/or materially misleading statements concealed the fact that Liquid was nothing but a vehicle for Defendants' self-dealing and personal enrichment. As the risks surrounding Defendants' conduct materialized during the Class Period, Liquid's stock price sank lower and lower. When the Section 10(b)

Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Liquid's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Liquid's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

296. Defendants failed to disclose to investors material information concerning the intentional disregard and knowing violation of internal controls within the Company, undisclosed related-party transactions, and premature recognition of revenue from the Company's most important customer, QuantX.

297. Additionally, as the Class Period progressed, investors became increasingly aware of certain risks that were previously undisclosed to them by the Section 10(b) Defendants. These risks pertained to the fact that Liquid was a sham and nothing but a vehicle for Defendants' self-dealing and personal enrichment. As the risks surrounding Defendants' conduct materialized during the Class Period, Liquid's stock price sank lower and lower. Each decline in Liquid's stock price is evidence that the risks concealed by the Section 10(b) Defendants gradually materialized. The total decline in Liquid's stock price is attributable to the Section 10(b) Defendants' fraudulent and/or reckless conduct pursuant to the materialization-of-the-risk doctrine.

**F. Presumption of Reliance: Fraud-On-The-Market**

298. At all relevant times, the market for Liquid's common stock was an efficient market for the following reasons, among others:

(a) Liquid's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Liquid communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Liquid was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) unexpected material news about Liquid was reflected in and incorporated into the Company's stock price during the Class Period.

299. As a result of the foregoing, the market for Liquid's common stock promptly digested current information regarding Liquid from all publicly available

sources and reflected such information in Liquid's stock price. Under these circumstances, all purchasers of Liquid's common stock during the Class Period suffered similar injury through their purchase of Liquid's common stock at artificially inflated prices, and a presumption of reliance applies.

300. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**G. Presumption of Reliance: Fraud-Created-The-Market**

301. In the alternative, Liquid's common stock should not have been introduced into the market at the time of the IPO because it was objectively unmarketable. Contrary to the information represented in Liquid's Registration Statement, Liquid's technology was not profitable and the Company only had one main customer. Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance

because they relied on the integrity of the market rather than on individual fraudulent disclosures.

**H. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

302. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

303. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

304. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Liquid who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT III

### Violation of Section 10(b) and SEC Rule 10b-5(b) against the Section 10(b) Defendants

305. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

306. This Count is asserted against the Section 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

307. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and

maintain the market price of Liquid securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Liquid's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

308. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Liquid's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Liquid's finances and business prospects.

309. By virtue of their positions at Liquid, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

310. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Liquid, the Section 10(b) Defendants had knowledge of the details of Liquid's internal affairs.

311. The Section 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Section 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of Liquid. As officers and/or directors of a publicly-held company, the Section 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Liquid's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Liquid's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Liquid's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Liquid's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the

securities and/or upon statements disseminated by Defendants, and were damaged thereby.

312. During the Class Period, Liquid's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Section 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Liquid's securities at prices artificially inflated by the Section 10(b) Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Liquid's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Liquid's securities declined sharply upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

313. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

314. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### Violation of Section 10(b) and SEC Rules 10b-5(a) and (c) against the Scheme Defendant

315. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

316. During the Class Period, the Scheme Defendant violated Rules 10b-5(a) and (c) in that he employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Liquid's publicly traded common stock during the Class Period as alleged herein. The Scheme Defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Liquid's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, the Scheme Defendant took the actions set forth herein.

317. The Scheme Defendant: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially high market prices for Liquid's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Scheme Defendant is sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

318. The Scheme Defendant, directly and indirectly, entered into an agreement for the sale and purchase of shares of Liquid common stock which had the effect of artificially inflating the price of Liquid common stock to Plaintiffs and the shareholders they represent in this class action.

319. The devices, schemes, and artifices constituting the Scheme Defendant's manipulative, deceitful, and fraudulent conduct consist of the Scheme Defendant's Stock Transfer Agreement disclosed by Liquid in the September 24, 2015 Form 8-K. As stated in the September 24, 2015 Form 8-K, Ferdinand and Von Allmen purchased an aggregate of $16.2 million of shares of Liquid's common stock in the IPO. In late-February 2014, entities controlled by Ferdinand and Keller transferred an additional 732,292 shares of Liquid common stock to Von Allmen

through D&L Partners for no cash consideration. The transfer of stock in late-February 2014 was pursuant to the Stock Transfer Agreement, which was entered into prior to the IPO and provided in pertinent part that additional shares of Liquid's common stock would be transferred to Von Allmen at no cost after the expiration of lock-up agreements signed by Ferdinand in connection with the IPO.

320. The execution of the Stock Transfer Agreement as well as the transfer of Liquid stock from Ferdinand and Keller to Von Allmen for no cost operated as a device, scheme, and artifice that resulted in manipulative, deceitful, and fraudulent conduct upon Plaintiffs and other investors. By executing the Stock Transfer Agreement and transferring the additional shares of Liquid stock for no cost, the Scheme Defendant led investors to believe that Liquid's stock was more valuable than it truly was. Liquid's Registration Statement indicated that the IPO would sell 3,175,000 shares at a price of $9.00 per share. Further, Liquid's Registration Statement indicated that Von Allmen and Ferdinand believed that the IPO price was fair and reasonable, given that they were purchasing $16.2 million of Liquid shares at $9.00 per share in the IPO. In fact, Von Allmen, who had purchased the vast majority of the $16.2 million of Liquid shares ($15,498,900, according to the "Principal Stockholder" table in the Registration Statement), purchased his shares for a price materially lower than $9.00 per share after accounting for the additional shares he received under the Stock Transfer Agreement. After accounting for the

additional shares received under the Stock Transfer Agreement, Von Allmen's per-share price for the shares he acquired was $6.31, approximately 30% lower than the price paid by public shareholders purchasing in the IPO. By creating the appearance that Ferdinand and Von Allmen were purchasing a significant amount of Liquid stock at the IPO price, the Scheme Defendant misled investors to believe that the IPO price was fair and reasonable.[3]

321. Additionally, by engaging in the scheme that he did, the Scheme Defendant was able to prevent the IPO from being undersubscribed and in all likelihood cancelled. As a result of the fraudulent scheme, the Scheme Defendant enabled the IPO to proceed and benefitted financially (through lucrative bonuses, as explained above).

322. The devices, schemes, and artifices constituting the Scheme Defendant's manipulative, deceitful, and fraudulent conduct are separate and apart from any fraudulent, negligent, and reckless conduct alleged herein in connection with any other counts or claims. The core misconduct alleged in connection with this

[3] The Registration Statement indicated that Von Allmen purchased 1,722,100 shares of Liquid common stock in the IPO. Registration Statement at 128. At the IPO price of $9.00 per share, Von Allmen's investment totaled $15,498,900. When accounting for the additional 732,292 shares received by Von Allmen pursuant to the Stock Transfer Agreement in late-February 2014 for no additional cost, Von Allmen's investment of $15,498,900 in fact bought him 2,454,392 shares of Liquid common stock. This results in a per-share price of $6.31.

claim is the Scheme Defendant's agreement to sell and/or purchase the Liquid shares itself (as opposed to the omission of the agreement from the Registration Statement). The Scheme Defendant's agreement to sell and/or purchase Liquid shares is, in and of itself, an inherently deceptive act that is distinct from any omission(s) within the Registration Statement.

323. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Liquid's publicly traded securities. Plaintiffs and the Class would not have purchased Liquid's publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Liquid's common stock had been artificially inflated by the Scheme Defendant's devices, schemes, and artifices to defraud.

## COUNT V

### Violation of Section 20(a) of the Exchange Act against the Section 20(a) Defendants

324. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

325. During the Class Period, the Section 20(a) Defendants participated in the operation and management of Liquid, and conducted and participated, directly and indirectly, in the conduct of Liquid's business affairs. Because of their senior positions, they knew the adverse non-public information about Liquid's misstatement of income and expenses and false financial statements.

326. As officers and/or directors of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Liquid's financial condition and results of operations, and to correct promptly any public statements issued by Liquid which had become materially false or misleading.

327. Because of their positions of control and authority as senior officers, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Liquid disseminated in the marketplace during the Class Period concerning Liquid's operations. Throughout the Class Period, the Section 20(a) Defendants exercised their power and authority to cause Liquid to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were "controlling persons" of Liquid within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Liquid's securities.

328. Each of the Section 20(a) Defendants, therefore, acted as a controlling person of Liquid. By reason of their senior management positions and/or being directors of Liquid, each of the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Liquid to engage in the unlawful acts and conduct complained of herein. Each of the Section 20(a) Defendants exercised control over the general operations of Liquid and possessed the power to control the

specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

329. By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Liquid.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

330. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Liquid securities during the Class Period (the "Class") and were damaged upon the revelation of the truth. Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

331. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Liquid securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records

maintained by Liquid or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 11, 2014, the date of the Company's last quarterly or annual report, there were 60,332,375 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

332. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

333. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

334. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Liquid;

(c) whether Defendants caused Liquid to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Liquid's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

335. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: July 27, 2017

**LEVI & KORSINSKY, LLP**

s/ Eduard Korsinsky
Eduard Korsinsky (EK-8989)
235 Main Street
Hackensack, New Jersey 07601
Tel.: (973) 265-1600
Fax: (212) 363-7171
Email: ek@zlk.com

-and-

Nicholas I. Porritt
Adam M. Apton
Adam McCall
1101 30th Street NW, Suite 115
Washington, DC 20007

Tel.: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: amccall@zlk.com

*Attorneys for Co-Lead Plaintiff Michael Sanders, the Richard Karl Schmidt Trust and Co-Lead Counsel for the Class*

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
Elizabeth A. Aniskevich
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW
Suite 500, East Tower
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
Email: dsommers@cohenmilstein.com
Email: dbunch@cohenmilstein.com
Email: eaniskevich@cohenmilstein.com

*Attorneys for Co-Lead Plaintiff Sidney R. Berger and Co-Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I, Eduard Korsinsky, hereby certify that on July 27, 2017, I authorized the electronic filing of the foregoing complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

s/ Eduard Korsinsky
Eduard Korsinsky